# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

PEOPLE v TAYLOR
PEOPLE v CZARNECKI

Docket Nos. 166428 and 166654. Argued on application for leave to appeal January 22, 2025. Decided April 10, 2025.

In Docket No. 166654, Andrew M. Czarnecki was convicted following a jury trial in the Wayne Circuit Court of having committed, among other offenses, first-degree premeditated murder, MCL 750.316(1)(a), when he was 19 years old. As required by MCL 750.316, the court, Michael M. Hathaway, J., sentenced Czarnecki to mandatory life in prison without the possibility of parole (LWOP) for the murder conviction. Czarnecki appealed, and in an unpublished per curiam opinion issued on June 10, 2021 (Docket No. 348732), the Court of Appeals, O'BRIEN, P.J., and STEPHENS and BOONSTRA, JJ., affirmed Czarnecki's sentences and convictions. Czarnecki sought leave to appeal. While the application was pending, the Supreme Court granted Czarnecki's motion to add as an issue to the application the question of whether his LWOP sentence was constitutional, and the Court held the appeal in abeyance pending the Supreme Court's decision in *People v Parks*, 510 Mich 225 (2022). Thereafter, the Supreme Court held in *Parks* that a statute subjecting 18-year-old offenders to mandatory LWOP constitutes unconstitutionally cruel punishment under Article 1, § 16 of Michigan's 1963 Constitution and that while a judge can still sentence an 18-year-old to LWOP, 18-year-old defendants convicted of first-degree murder are entitled to the full protections that exist within the individualized sentencing procedure of MCL 769.25 prior to that determination. After *Parks* was decided, the Supreme Court denied Czarnecki's application in part but remanded the case to the Court of Appeals for reconsideration in light of *Parks*. 510 Mich 1093 (2022). On remand and on reconsideration, the Court of Appeals affirmed Czarnecki's sentence, reasoning that *Parks* did not expressly apply to anyone older than age 18 and that *Parks* did not expressly overrule *People v Hall*, 396 Mich 650 (1978), which held that mandatory LWOP for felony murder did not violate Const 1963, art 1, § 16. ___ Mich App ___ (December 14, 2023) (Docket No. 348732).

In Docket No. 166428, Montario M. Taylor was convicted following a jury trial in the Genesee Circuit Court of having committed first-degree premeditated murder, MCL 750.316(1)(a), and felony-firearm, MCL 750.227b, when he was 20 years old. The court, Richard B. Yuille, J., sentenced Taylor to mandatory LWOP for the first-degree murder conviction and to a consecutive term of two years in prison for the felony-firearm conviction. Taylor appealed, raising numerous issues, including a challenge to the constitutionality of his LWOP sentence. In

an unpublished per curiam opinion issued on October 21, 2021 (Docket No. 349544), the Court of Appeals, SHAPIRO, P.J., and BORRELLO and O'BRIEN, JJ., affirmed Taylor's convictions and sentences and specifically rejected Taylor's argument that a mandatory LWOP sentence for a defendant who committed first-degree murder as a 20-year-old violates US Const, Am VIII or Const 1963, art 1, § 16. Taylor sought leave to appeal. After *Parks* was decided, the Supreme Court vacated the portion of the Court of Appeals' decision regarding the constitutionality of Taylor's LWOP sentence, remanded the case to the Court of Appeals for reconsideration in light of *Parks*, and denied leave in all other respects. 511 Mich 901 (2023). On remand, in an unpublished per curiam opinion issued on October 5, 2023, the Court of Appeals, SHAPIRO, P.J., and BORRELLO and O'BRIEN, JJ., affirmed Taylor's sentence, noting (1) the "self-limited scope of the *Parks* opinion"; (2) the binding decision in *People v Adamowicz (On Second Remand)*, 346 Mich App 213 (2023), which held that a mandatory sentence of LWOP for the 21-year-old defendant convicted of first-degree murder did not violate Const 1963, art 1, § 16; and (3) the continuing binding nature of *Hall*.

Czarnecki and Taylor separately sought leave to appeal. In Czarnecki's case, the Supreme Court ordered oral argument on the application, directing the parties to address whether the holding in *Parks* should be extended to individuals who commit first-degree murder when they are 19 years old. In addition, Czarnecki was ordered to address whether such an extension required overruling *Hall*, which upheld as constitutional a mandatory term of LWOP for a felony murder committed by a 17-year-old defendant. 513 Mich 1146 (2024). In Taylor's case, after initially holding the case in abeyance, the Supreme Court ordered oral argument on the application, directing the parties to address whether *Parks* should be extended to individuals who commit first-degree murder when they are 20 years old, as well as whether such an extension required overruling *Hall*. ___ Mich ___ (October 30, 2024) (Docket No. 166428).

In an opinion by Justice WELCH, joined by Justices BERNSTEIN, CAVANAGH, BOLDEN, and THOMAS, the Supreme Court, in lieu of granting leave to appeal, *held*:

The Court's decision in *Parks* was extended to individuals who were 19 or 20 years old at the time of the crime for which they were convicted. Mandatorily subjecting 19- and 20-year-old defendants convicted of first-degree murder to an LWOP sentence violates the principle of proportionality derived from the Michigan Constitution and constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16. Czarnecki's and Taylor's automatic LWOP sentences were unconstitutional. While a judge can still sentence 19- or 20-year-olds to LWOP, Czarnecki, Taylor, and other 19- or 20-year-old defendants convicted of first-degree murder are entitled to the full protections that exist within the individualized sentencing procedures of MCL 769.25 or MCL 769.25a before that determination. This rule applies retroactively to criminal cases on collateral review. It was unnecessary to overrule *Hall* at this time, and its holding remained viable so long as the defendant was at least 21 years old at the time of the offense.

1. Article 1, § 16 of Michigan's Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" The state's prohibition on cruel *or* unusual punishment is broader and more protective than that of the Eighth Amendment of the United States Constitution, which prohibits cruel *and* unusual punishment. To determine what constitutes cruel or unusual punishment, courts must consider evolving standards of decency that mark the progress of a

maturing society. Article 1, § 16 also requires that criminal sentences be proportional to the circumstances of the offense and of the offender such that excessive imprisonment is prohibited. As set forth in *People v Lorentzen*, 387 Mich 167 (1972), and reaffirmed in *People v Bullock*, 440 Mich 15 (1992), and *Parks*, when evaluating whether a sentence is proportional under Const 1963, art 1, § 16, courts must consider: (1) the severity of the punishment relative to the gravity of the offense, (2) punishments imposed in the same jurisdiction for other offenses, (3) punishments imposed in other jurisdictions for the same offense, and (4) Michigan's traditional goal of and preference for rehabilitation. Courts have an obligation to consider objective, undisputed scientific evidence when determining whether a punishment is cruel or unusual as to a certain class of defendants. In *Parks*, the Supreme Court held that mandatorily subjecting 18-year-old defendants to LWOP violates the principle of proportionality and thus constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16 and that such defendants are entitled to an individualized resentencing hearing under MCL 769.25. In reaching that conclusion, the Court noted the United States Supreme Court's recognition in *Miller v Alabama*, 567 US 460 (2012), and *Montgomery v Louisiana*, 577 US 190 (2016), that a defendant's youth at the time of committing a crime is relevant to assessing the constitutionality of the punishment imposed. The *Parks* decision was also motivated by a concern for the severity of mandatory punishment given that a lifetime in prison is a disproportionate sentence for all but the rarest of children. As required by *Parks*, when a prosecutor files a motion under MCL 769.25 or MCL 769.25a to seek LWOP for a defendant who was 18 years old when they committed the sentencing offense, there is a rebuttable presumption against LWOP that the prosecutor must overcome by clear and convincing evidence at a hearing. During such hearings, the sentencing court must consider any relevant attributes of youth associated with the defendant as a mitigating factor.

2. To resolve whether *Parks* should be extended to 19- and 20-year-olds, the Court looked to objective, undisputed scientific research regarding the late-adolescent brain, the legal rights of late adolescents, and the constitutionality of mandatory LWOP for late adolescents. Modern and unrebutted developments in such research established that characteristics that are intrinsic to the cognitive and social development of juveniles, such as an increased susceptibility to peer pressure, result in their having both diminished culpability and greater prospects for reform, and thus make them less deserving of the most severe punishments. Because 19- and 20-year-olds are more similar to juveniles in neurological terms than they are to older adults, the scientific research relied on by the *Parks* Court applied equally to 19- and 20-year-old individuals. While some state and federal laws provide 18-year-olds with new legal rights and privileges, society generally does not recognize these individuals as full adults until the age of 21, as indicated by laws applying to the right or privilege to serve as an elected state legislator, consume or possess alcohol or recreational cannabis, obtain a concealed pistol license, or open a credit card without a cosigner. To determine the constitutionality of mandatory LWOP for 19- and 20-year-old defendants, the four-factor *Lorentzen-Bullock* test was applied. Considering the first factor, while first-degree murder is one of the most severe and heinous crimes an individual can commit, mandatory LWOP is the most severe punishment that can be imposed. Imposing an LWOP sentence on late adolescents will result in them inevitably serving more time and a greater percentage of their life in prison as compared to older adult offenders. However, the impulsivity of the late-adolescent brain is transient and capable of change, making imposition of mandatory LWOP on this class of individuals particularly cruel; it also prevents trial courts from tailoring the sentence imposed to the defendant. The second factor, comparing the punishment for first-degree murder to that of

other crimes in Michigan, mandatory LWOP is the harshest sentence and can only be imposed for a limited number of convictions that are highly dangerous offenses and reflect a high degree of moral guilt. As is true for 18-year-olds, late-adolescent defendants who are convicted and sentenced to LWOP will often serve more time in prison than older individuals convicted of the identical crime. Relevant to the third factor, which is comparing punishments imposed in other jurisdictions for the same offense, is that Michigan is among a minority of states that legislatively mandate LWOP for all individuals convicted of first-degree murder. Further, the United Kingdom prohibits LWOP sentences for anyone under the age of 21, and in Canada all sentences of life without a realistic possibility of parole are unconstitutional for all convicted offenders, regardless of age. These national and international trends illustrate that the evolving standards of decency are trending away from imposing mandatory LWOP on late adolescents. With regard to the fourth and final factor, as evidenced by historical practices in Michigan, this state has a longstanding goal of and preference for punishments that allow for rehabilitation, and it is undisputed that this goal is not accomplished when a mandatory LWOP sentence is imposed. Accordingly, all four factors weighed in favor of requiring individualized sentencing before a trial court may impose a sentence of LWOP on a 19- or 20-year-old. In *People v Poole*, ___ Mich ___ (April 1, 2025) (Docket No. 166813), the Court held that *Parks* applied retroactively to criminal cases on collateral review. The *Poole* retroactivity analysis applied equally in this case; therefore, this holding applied retroactively to criminal cases on collateral review.

3. The continued viability of *Hall* was questionable given the evolution of federal and state precedent interpreting US Const, Am XIII, and Const 1963, art 1, § 16, since the case was decided. However, it was unnecessary to overrule *Hall* because when the *Hall* Court rejected the defendant's *facial* challenge, it did not address the issue of sentencing a juvenile to an LWOP sentence. Thus, *Hall* was inapplicable to the *as-applied* challenge brought by Czarnecki and Taylor in these cases, and the holding in *Hall* remained viable so long as the defendant was at least 21 years old at the time of the offense.

4. In this case, Czarnecki and Taylor were 19 years old and 20 years old, respectively, when they committed the premeditated murders for which they were convicted. Both were sentenced to mandatory LWOP as required by MCL 750.316, but neither defendant received the specialized procedures mandated by MCL 769.25 or MCL 769.25a before those sentences were imposed, despite being members of a class presumptively neurologically indistinguishable from either a teenage juvenile offender or an 18-year-old offender. Czarnecki and Taylor were entitled to be resentenced in accordance with MCL 769.25, this opinion, and relevant caselaw because the procedures used at their sentencing hearings violated Michigan's Constitution. The Supreme Court denied leave in all other respects for failure to persuade the Court of the need for review.

Court of Appeals' opinion on remand in each case reversed, each defendant's sentence for first-degree murder vacated, and each case remanded to the appropriate circuit court for resentencing.

Justice BERNSTEIN, concurring in part and dissenting in part, largely agreed with the majority's analysis and with the conclusion that the imposition of mandatory LWOP on 19- and 20-year-old offenders violated Const 1963, art 1, § 16. He wrote separately to note his disagreement with a bright-line rule drawn at age 21, explaining that bright-line rules are

problematic because they are underinclusive. However, if drawing any line were necessary, Justice BERNSTEIN would have drawn the line at 25 to be in line with the relevant scientific studies regarding late-adolescent brain development. The better approach would be to allow for a shifting age-based presumption that could consider individual characteristics of diminished culpability, but these cases did not present the Court with the opportunity to consider such an option.

Chief Justice CLEMENT, joined by Justice ZAHRA, dissenting, would not have extended *Parks*'s rule to offenders who were 19 and 20 years old when they committed first-degree premeditated murder because Const 1963, art 1, § 16 did not compel that result. When applying the first factor considered in the *Lorentzen-Bullock* proportionality test, the gravity of the offense as opposed to the severity of the punishment, first-degree premeditated murder is arguably the gravest offense under Michigan law, and it deserves the most severe sentence in Michigan. The majority overemphasized the characteristics of the offender who committed the offense by focusing on the length of time a young defendant will spend in prison as compared with an older offender, rather than focusing on the offense committed. By doing so, the majority downplayed the gravity of first-degree murder and instead erroneously focused on the actuarial life expectancy of the offender in its constitutional analysis. Chief Justice CLEMENT agreed that young offenders are still developing neurologically but stated that it was up to the Legislature to prohibit LWOP for 19- and 20-year-old offenders, not the judiciary. Thus, the first factor weighed in favor of constitutionality. The second factor, the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, also weighed in favor of finding the penalty constitutional. The Legislature exercised its judgment that some crimes are so severe, and those who commit them so culpable, that LWOP is the only appropriate punishment. That mandatory LWOP applies to other homicide offenses, as well as to the nonhomicide offense of first-degree criminal sexual conduct, underscores that Michigan law recognizes that the most serious crimes— whether or not they involve the taking of life—are so severe that parole should never be an option. The third factor, the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, weighed in favor of finding the penalty constitutional. Michigan's sentencing scheme is consistent with those in a substantial portion of the country, which distinguished these cases from pre-*Parks* precedent such as *Bullock* and *Lorentzen*. The majority's use of selective and nonbinding out-of-state court decisions and foreign law was unpersuasive. Finally, although the fourth factor, whether the penalty imposed advances the penological goal of rehabilitation, did not weigh in favor of the penalty's constitutionality given that a defendant sentenced to mandatory LWOP has little realistic chance for parole, rehabilitation is only one of several sentencing goals. Nevertheless, given that the first three factors strongly favored a finding of constitutionality as applied to 19- and 20-year-old offenders, Chief Justice CLEMENT would have held that mandatory LWOP is constitutional as applied to this class of offenders. The majority's reliance on neuroscience to reach its conclusion demonstrated that its decision was based in large part on policy, and policy decisions should be left to the Legislature. Finally, the majority's further extension of *Miller*'s protections to 19- and 20-year-old offenders had no logical stopping point and opened the door to other related claims.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

FILED April 10, 2025

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                 No. 166428

MONTARIO MARQUISE TAYLOR,

        Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                 No. 166654

ANDREW MICHAEL CZARNECKI,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

WELCH, J.

Following separate and unrelated jury trials, defendants were each convicted of first-degree murder. Defendant Andrew Czarnecki was 19 years old at the time of his offense, while defendant Montario Taylor was 20 years old at the time of his. Each defendant was sentenced to a legislatively mandated punishment of life in prison without the possibility of parole (LWOP). Defendants argue that the mandatory nature of their sentences violates Michigan's prohibition against "cruel or unusual punishment," Const 1963, art 1, § 16, and they ask us to extend our decision in *People v Parks*, 510 Mich 225, 268; 987 NW2d 161 (2022), where we held that, under our state Constitution, *mandatory* LWOP sentences are cruel or unusual when applied to 18-year-olds.

We agree with defendants and extend *Parks* to individuals who were 19 or 20 years old at the time of the crime for which they were convicted. Our Constitution and caselaw interpreting it requires us to evaluate the proportionality of defendants' sentences. To do so, we use the factors laid out in *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), and *People v Bullock*, 440 Mich 15; 485 NW2d 866 (1992), which incorporate evolving standards of decency that mark the progress of a civilized society. Late adolescents who are 19 or 20 years old, as a class, share with 18-year-olds the same mitigating characteristics of late-adolescent brain development. The same considerations that were discussed at length in *Parks* apply equally to this class of late adolescents. Accordingly, as applied to defendants who were 19 or 20 years old at the time of their crime, a *mandatory* LWOP sentence that does not allow for consideration of the mitigating factors of youth or the potential for rehabilitation is a grossly disproportionate punishment in violation of Const 1963, art 1, § 16. Czarnecki and Taylor are, therefore, entitled to be resentenced in the manner set forth in MCL 769.25 and our relevant caselaw.

2

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *PEOPLE v CZARNECKI*

Andrew Czarnecki is serving a mandatory LWOP sentence for his role in the premediated murder of Gavino Rodriguez. Czarnecki was 19 years old when he participated in the murder. Czarnecki was charged with first-degree premeditated murder, MCL 750.316(1)(a); first-degree felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; carjacking, MCL 750.529a; and mutilating a dead body, MCL 750.160. During the five-day jury trial in late 2018, the prosecution presented various forms of evidence to support its theory that Czarnecki and Hameer Alkotiat jointly participated in the murder of Rodriguez.[1]

The jury acquitted Czarnecki of carjacking but otherwise found him guilty as charged. At sentencing, the trial court vacated the first-degree felony-murder conviction and imposed a mandatory sentence of LWOP for first-degree premeditated murder, 11 to 20 years' imprisonment for armed robbery, and $4\frac{1}{2}$ to 10 years' imprisonment for mutilation of a dead body.

Czarnecki appealed to the Court of Appeals, which affirmed Czarnecki's conviction. *People v Czarnecki*, unpublished per curiam opinion of the Court of Appeals, issued June 10, 2021 (Docket No. 348732). Czarnecki sought leave to appeal in this Court,

---

[1] Although Alkotiat was scheduled to be tried jointly with Czarnecki, he was granted a last-minute adjournment because his attorney experienced an unexpected medical issue. Alkotiat later pleaded guilty to second-degree murder, MCL 750.317, and was sentenced to a minimum term of 18 years' imprisonment. *People v Czarnecki*, unpublished per curiam opinion of the Court of Appeals, issued June 10, 2021 (Docket No. 348732), p 2 n 2. According to the Michigan Department of Corrections' Offender Tracking Information System, Alkotiat was 18 years old when he participated in the murder.

raising many of the issues argued below. Czarnecki also asserted that a mandatory sentence of LWOP for a murder committed when he was 19 years old is unconstitutional under the Eighth Amendment of the United States Constitution, US Const, Am VIII, or the analogous provision of Michigan's Constitution, Const 1963, art 1, § 16. After first holding Czarnecki's application in abeyance to await this Court's decision in *Parks*, 510 Mich 225, we remanded to the Court of Appeals "for consideration of whether the defendant's mandatory sentence of life without parole for a murder committed at the age of 19 is cruel or unusual punishment under Const 1963, art 1, § 16." *People v Czarnecki*, 510 Mich 1093, 1093 (2022). We denied leave to appeal in all other respects. *Id*.

On remand, the Court of Appeals affirmed Czarnecki's sentence of LWOP in a unanimous published decision. *People v Czarnecki (On Remand, On Reconsideration)*, ___ Mich App ___; ___ NW3d ___ (December 14, 2023) (Docket No. 348732). The panel noted that *Parks* did not expressly apply to anyone older than age 18 and that *Parks* expressly did not overrule *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1978), which held that mandatory LWOP for felony murder did not violate Const 1963, art 1, § 16. *Czarnecki (On Remand, On Reconsideration)*, ___ Mich App at ___; slip op at 2. The panel also observed that this Court denied the defendant's application for leave to appeal from the decision in *People v Adamowicz (On Second Remand)*, 346 Mich App 213, 219; 12 NW3d 35 (2023),[2] which held that a mandatory sentence of LWOP for the 21-year-old defendant convicted of first-degree murder did not violate Const 1963, art 1, § 16. *Czarnecki (On Remand, On Reconsideration)*, ___ Mich App at ___; slip op at 2.

---

[2] See *People v Adamowicz*, 513 Mich 869 (2023).

4

Accordingly, the Court of Appeals reasoned that *Hall* remained binding precedent for defendants older than 18 and that Czarnecki's mandatory sentence of LWOP was therefore not unconstitutional. *Id*. at ___; slip op at 3.

## B. *PEOPLE v TAYLOR*

Montario Taylor is serving a mandatory sentence of LWOP for the premeditated murder of Montel Wright inside Wright's home in Flint, Michigan on October 24, 2016. Taylor was 20 years old when he committed the murder. Taylor's first trial resulted in a hung jury. Following the second trial, a jury convicted Taylor of first-degree premeditated murder, MCL 750.316(1)(a), and felony-firearm, MCL 750.227b. The trial court sentenced Taylor to a mandatory term of LWOP for the murder conviction, plus a mandatory consecutive two-year sentence for the felony-firearm conviction.

Taylor appealed to the Court of Appeals, raising various alleged errors, including a challenge to the constitutionality of his LWOP sentence. The Court rejected each of these arguments and affirmed Taylor's convictions and sentences. *People v Taylor*, unpublished per curiam opinion of the Court of Appeals, issued October 21, 2021 (Docket No. 349544). The panel specifically rejected Taylor's argument that a mandatory LWOP sentence for a 20-year-old defendant convicted of first-degree murder violates US Const, Am VIII, or Const 1963, art 1, § 16. *Id*. at 12-13.

Taylor sought leave to appeal in this Court. After we issued our decision in *Parks*, we vacated the portion of the Court of Appeals' decision concerning the constitutionality of Taylor's sentence and remanded to that Court for reconsideration in light of *Parks*. *People v Taylor*, 511 Mich 901 (2023). We denied leave to appeal in all other respects.

On remand, the Court of Appeals affirmed Taylor's sentence. *People v Taylor (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued October 5, 2023 (Docket No. 349544). The panel noted the "self-limited scope of the *Parks* opinion," the recent binding decision in *Adamowicz (On Second Remand)*, 346 Mich App 213, and the continued binding nature of *Hall*, 396 Mich at 657-658. *Taylor (On Remand)*, unpub op at 2-3. The Court determined that it was bound by *Hall* and *Adamowicz (On Second Remand)*, and on that basis, it rejected Taylor's argument that his mandatory sentence of LWOP violated Const 1963, art 1, § 16. *Taylor (On Remand)*, unpub op at 3.

### C. THE CURRENT APPEALS BEFORE THIS COURT

Both Czarnecki and Taylor sought leave to appeal to this Court. In Czarnecki's case, we ordered oral argument on the application and directed the parties to address whether our holding in *Parks* regarding mandatory LWOP should be extended to a 19-year-old defendant, whether such an extension requires overruling *Hall*, and if so, whether *Hall* should be overruled. *People v Czarnecki*, 513 Mich 1146, 1146 (2024). While initially held in abeyance, we ordered oral argument on the application in Taylor's case and directed the parties to address the same questions posed in our order for Czarnecki, but with a focus on 20-year-old defendants. *People v Taylor*, ___ Mich ___, ___; 12 NW3d 444 (2024).[3] Arguments on Taylor's application took place during the same session as the arguments in Czarnecki's case and in *People v Poole* (Docket No. 166813), which concerned the retroactivity of our decision in *Parks*.

---

[3] We also vacated our previous order directing oral argument in *People v Bouie* (Docket No. 166232) and placed the application in that case in abeyance pending resolution of Czarnecki's and Taylor's appeals. *People v Bouie*, ___ Mich ___; 12 NW3d 437 (2024).

6

## II.  STANDARD OF REVIEW

Whether a legislatively imposed mandatory punishment violates Const 1963, art 1, § 16 is a question of law.  This Court reviews de novo questions of constitutional law. *Parks*, 510 Mich at 245.  " '[T]he ultimate authority with regard to the meaning and application of' " Michigan's Constitution rests solely with this Court.  *Id*., quoting *Bullock*, 440 Mich at 27.

## III.  CONSTITUTIONAL FRAMEWORK
### A.  CRUEL OR UNUSUAL PUNISHMENT

Michigan's Constitution states, "Excessive bail shall not be required; excessive fines shall not be imposed; *cruel or unusual punishment shall not be inflicted*; nor shall witnesses be unreasonably detained."  Const 1963, art 1, § 16 (emphasis added).  Determining what constitutes cruel or unusual punishment is guided by " 'evolving standards of decency that mark the progress of a maturing society.' "[4]  *Parks*, 510 Mich at 241, quoting *Lorentzen*, 387 Mich at 179.  As we recently reaffirmed, "[t]he definition of this standard is 'progressive and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.' "  *Id*., quoting *Lorentzen*, 387

---

[4] The United States Supreme Court has also traditionally read the Eighth Amendment through the lens of "evolving standards of decency that mark the progress of a maturing society . . . ."  *Roper v Simmons*, 543 US 551, 561; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (quotation marks and citation omitted).  "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons."  *Id*. at 560.  "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances."  *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010).  We reject the Wayne County Prosecutor's invitation to abandon our longstanding use of the evolving-standards-of-decency lens for analysis of punishments under Const 1963, art 1, § 16.

Mich at 179. Inherent in this standard is the understanding that as society progresses, punishments that were once acceptable can later be considered cruel or unusual. By necessity, the test "looks to comparative law for guidelines in determining what penalties are widely regarded as proper for the offense in question." *Lorentzen*, 387 Mich at 179.

In *Bullock*, 440 Mich at 30-35, we held that the state prohibition on " 'cruel *or* unusual punishment,' " Const 1963, art 1, § 16 (emphasis added), is broader and more protective than the prohibition against " 'cruel *and* unusual' " punishment contained in US Const, Am VIII (emphasis added). We were compelled to reach this conclusion based on textual differences, historical factors, and longstanding Michigan precedent.[5] *Bullock*, 440 Mich at 30-35. Additionally, Const 1963, art 1, § 16 requires that criminal sentences be proportional to the circumstances of the offense and of the offender such that excessive imprisonment is prohibited. *Id*. at 33-34. These constitutional mandates can require the "analytically difficult and politically unpopular" step of "overrid[ing] a democratically expressed judgment of the Legislature." *Id*. at 41. After all, "[t]he very purpose of a constitution is to subject the passing judgments of temporary legislative or political majorities to the deeper, more profound judgment of the people reflected in the constitution, the enforcement of which is entrusted to our judgment." *Id*.

Accordingly, to evaluate the proportionality of a punishment under Michigan's Cruel or Unusual Punishment Clause, courts must consider: (1) the severity of the punishment relative to the gravity of the offense, (2) punishments imposed in the same

---

[5] We reject the invitation of the Prosecuting Attorneys Association of Michigan to abandon our 33-year-old precedent in *Bullock* that Const 1963, art 1, § 16 is broader and more protective than the Eighth Amendment.

8

jurisdiction for other offenses, (3) punishments imposed in other jurisdictions for the same offense, and (4) Michigan's traditional goal of and preference for rehabilitation. *Parks*, 510 Mich at 242, citing *Bullock*, 440 Mich at 33-34; *Lorentzen*, 387 Mich at 176-181. In *Parks*, we concluded that "mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole violates the principle of proportionality derived from" Const 1963, art 1, § 16. *Parks*, 510 Mich at 268.

## B. PROTECTIONS AGAINST CRUEL OR UNUSUAL PUNISHMENT FOR LATE ADOLESCENTS

Our decision in *Parks* drew from several sources, including the United States Supreme Court's admonishment regarding the constitutional sentencing of youth, Michigan's constitutional text and caselaw, and scientific consensus concerning late-adolescent development. We recognized that when applying the Eighth Amendment, the United States Supreme Court had already recognized that a defendant's youth at the time of committing a crime was relevant to assessing the constitutionality of the punishment imposed. *Parks*, 510 Mich at 234-241. Youth was a key factor in that Court's decision to abolish the death penalty for juvenile offenders, *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005); to abolish all LWOP sentences for nonhomicide offenses committed by juveniles, *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010); and to abolish mandatory LWOP sentences for juveniles, *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).[6]

---

[6] In each case, the United States Supreme Court defined "juvenile" as an individual under the age of 18 at the time the sentencing offense was committed. See *Roper*, 543 US at 555-556; *Graham*, 560 US at 52-53, 74-75, 81; *Miller*, 567 US at 465.

Like the United States Supreme Court, we recognized that because characteristics that are intrinsic to the cognitive and social development of juveniles mean that they have both diminished culpability and greater prospects for reform, they are thus " 'less deserving of the most severe punishments.' " *Parks*, 510 Mich at 235, quoting *Miller*, 567 US at 471. *Miller* was later clarified as providing not merely a procedural protection but, instead, a substantive federal constitutional protection in *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016). Although that holding was potentially limited by *Jones v Mississippi*, 593 US 98, 110 n 4; 141 S Ct 1307; 209 L Ed 2d 390 (2021), "*Miller*, *Montgomery*, and *Jones* did not question or reform the bright [age-based] line drawn in *Roper*." *Parks*, 510 Mich at 246. Nor did the *Jones* Court overturn precedent holding that youth matters in sentencing, as we recognized in *People v Boykin*, 510 Mich 171, 193; 987 NW2d 58 (2022). While Michiganders cannot receive less constitutional protection than that provided under the federal Constitution, we noted that Michigan's broader constitutional prohibition against "cruel or unusual punishment" under Const 1963, art 1, § 16, did not require us to draw the same line as federal courts when determining which class of adolescents receives constitutional protection. See *id*. at 247-248.

The United States Supreme Court has also warned against mandatorily imposing the harshest punishment available. See *Woodson v North Carolina*, 428 US 280, 292-293; 96 S Ct 2978; 49 L Ed 2d 944 (1976) (opinion by Stewart, Powell, and Stevens, JJ.) (invalidating mandatory death penalty statutes as "unduly harsh and unworkably rigid"). We share this concern and have previously found that our state Constitution provides greater protection than the federal Constitution against extreme mandatory punishments. Compare *Bullock*, 440 Mich at 21, 30, 37-41 (invalidating as cruel or unusual a mandatory

10

LWOP sentence for the conviction of possession of 650 grams or more of any mixture containing cocaine), with *Harmelin v Michigan*, 501 US 957; 111 S Ct 2680; 115 L Ed 2d 836 (1991) (refusing to invalidate a mandatory sentence of life without the possibility of parole for the conviction of possession of 650 grams or more of cocaine on the grounds that it was not unusual).  Although we did not cite *Woodson* or *Harmelin*, our decision in *Parks* was similarly motivated by this concern for mandatory punishment, as we noted that "a lifetime in prison is a disproportionate sentence for all but the rarest of children[.]" *Parks* 510 Mich at 240 (quotation marks omitted), quoting *Montgomery*, 577 US at 195, in turn quoting *Miller*, 567 US at 195, in turn quoting *Roper*, 543 US at 573.

*Parks* also relied on modern developments in scientific and social-science research concerning the "characteristics of the late-adolescent 18-year-old brain." *Id*. at 248.  These considerations were consistent with the approach used by the United States Supreme Court when applying the Eighth Amendment and were required by our Constitution given our responsibility to "consider objective, undisputed scientific evidence when determining whether a punishment is unconstitutional as to a certain class of defendants." *Parks*, 510 Mich at 249.  We noted the consensus that the late-adolescent brain carries exceptional neuroplasticity during this crucial stage of cognitive development, which has "significant consequences for young adults' behavior."  *Id*. at 250.  We adopted the unrefuted conclusion that, in terms of neurological development, "there is no meaningful distinction between" a 17-year-old and an 18-year-old, and we observed that this stage of neuroplasticity "blurs the already thin societal line between childhood and young adulthood." *Id*. at 252.

Applying the four-factor test outlined in *Bullock* and *Lorentzen*, we concluded that imposition of mandatory LWOP for an 18-year-old individual without consideration of their relevant attributes of youth or potential for rehabilitation resulted in "unusually excessive imprisonment and thus a disproportionate sentence that constitutes 'cruel or unusual punishment' under Const 1963, art 1, § 16." *Parks*, 510 Mich at 255.

We therefore held that mandatorily subjecting 18-year-old defendants to LWOP was unconstitutional and that such defendants are entitled to an individualized resentencing hearing. *Id*. at 267-268. We also made clear that other decisions of this Court providing juvenile offenders additional legal protections even when convicted of heinous crimes, including "*all* protections afforded by MCL 769.25," applied to 18-year-old defendants.[7] *Parks*, 510 Mich at 267. The default term-of-years sentence for an 18-year-old defendant is therefore a minimum of 25 to 40 years' imprisonment and a maximum of at least 60 years' imprisonment. *Id*. at 267 n 19, citing MCL 769.25(9). And when a prosecutor files

---

[7] The Legislature enacted MCL 769.25 and MCL 769.25a after the United States Supreme Court's decision in *Miller*. The enactment of MCL 769.25 eliminated *mandatory* sentences of LWOP for juveniles affected by *Miller*, and MCL 769.25a created a resentencing scheme that would apply if *Miller* was given retroactive application. *People v Boykin*, 510 Mich 171, 180 n 2; 987 NW2d 58 (2022). The statutes did not eliminate the possibility of LWOP for first-degree murder for affected defendants, but it eliminated mandatory sentences by creating a procedure through which a prosecutor could seek an LWOP sentence. *Id*. The statutes further specified the procedures and findings required of sentencing and resentencing hearings for affected defendants, whether life imprisonment was sought or not. *Id*. These sentencing procedures are colloquially known as "*Miller* hearings." *People v Taylor*, 510 Mich 112, 122; 987 NW2d 132 (2022). After the statutes were enacted, the United States Supreme Court held that *Miller* applied retroactively. *Montgomery*, 577 US 190. Thus, these statutes set forth the sentencing and resentencing procedures for when a prosecutor seeks an LWOP sentence for a juvenile offender. In *Parks*, we extended the same procedures to 18-year-old defendants. *Parks*, 510 Mich at 267.

a motion under MCL 769.25 or MCL 769.25a to seek LWOP for a defendant who was 18 years old when they committed the sentencing offense, there is a rebuttable presumption against LWOP that the prosecutor must overcome by clear and convincing evidence at a hearing. *Parks*, 510 Mich at 267 n 19, citing *People v Taylor*, 510 Mich 112, 130-132; 987 NW2d 132 (2022). During such hearings, the sentencing court must consider any relevant attributes of youth associated with the defendant as a mitigating factor. *Parks*, 510 Mich at 267 n 19, citing *People v Boykin*, 510 Mich 171, 189; 987 NW2d 58 (2022). However, a sentencing court only needs to articulate such considerations on the record if sentencing a youthful offender to LWOP. *Boykin*, 510 Mich at 190-194.

## IV. ANALYSIS

Today we extend *Parks* and its holdings to offenders who were 19 or 20 years old when they committed the offense for which they were convicted. Mandatorily condemning such offenders to die in prison, without first considering the attributes of youth that late adolescents and juveniles share, no longer comports with the "evolving standards of decency that mark the progress of a maturing society." *Lorentzen*, 387 Mich at 179 (quotation marks and citation omitted). We do not foreclose the possibility that LWOP could be an appropriate punishment under rare circumstances, but as in *Parks*, "our Constitution compels us to make . . . difficult decisions." *Parks*, 510 Mich at 245. Article 1, § 16 of our state Constitution does not permit the imposition of such punishment against this class of late adolescents without individualized sentencing.[8] Accordingly,

---

[8] The dissent notes that our holding in *People v Carp*, 496 Mich 440, 521; 852 NW2d 801 (2014), cert gtd and opinion vacated on other grounds sub nom *Carp v Michigan*, 577 US 1186 (2016)—that Const 1963, art 1, § 16 does not *categorically* prohibit the imposition of LWOP as a punishment against juvenile offenders—survives this Court's decision in

individuals convicted of first-degree murder for conduct occurring when they are 19 or 20 years old must receive the same individualized sentencing procedure under MCL 769.25, and our related decisions, as juveniles who have committed first-degree murder.[9] See *Parks*, 510 Mich at 267 n 19.

Our holding is premised on an application of the test that was first articulated in *Lorentzen* and later reaffirmed in *Bullock* and *Parks* to a mandatory punishment imposed on a class of late-adolescent defendants. As in *Parks*, our application of the law includes consideration of the well-established scientific consensus concerning late-adolescent brain development and the neuroplasticity associated with that stage of development. Our analysis in *Parks* also evaluated the correlation between a person's age and the legal rights and responsibilities granted to them by society. We provide some background as to these considerations before applying the governing legal test.

---

*People v Poole*, ___ Mich ___; ___ NW3d ___ (April 1, 2025) (Docket No. 166813). We question what weight, if any, that part of *Carp* retains after the vacatur of the decision as to other threshold legal issues and this Court's failure to readopt on remand the holding that the dissent now relies on. But that part of *Carp* is also irrelevant. The analysis from *Carp* was focused on a facial constitutional challenge to LWOP as punishment for juveniles, not an as-applied constitutional challenge to the imposition of *mandatory* LWOP to a class of offenders sharing an age-based characteristic.

[9] We do not dispute the dissent's point that some of the mitigating characteristics discussed in the scientific research relied on in *Parks* and submitted by defendants and amici in these cases are relevant up to at least age 25. Considering that defendants here were age 19 and 20 at the time they committed their crimes, resolution of the issues before the Court does not require us to consider whether Const 1963, art 1, § 16 would require granting the same relief to late adolescents who were 21 or older at the time of their offense.

14

## A.  THE LATE-ADOLESCENT BRAIN

We have previously recognized the scientific consensus that late adolescents, as a class, "are hampered in their ability to make decisions, exercise self-control, appreciate risks or consequences, feel fear, and plan ahead," and are more prone to impulsive, reckless, and risk-taking behavior.  *Id*. at 250.  Defendants and amici agree that the scientific research relied on in *Parks* applies equally to 19- and 20-year-old individuals.  The prosecutors do not dispute this research but oppose the expansion of *Parks* despite the Court's reliance on scientific research more broadly in other contexts.

Late adolescents are widely recognized as being more "susceptible to negative outside influences, including peer pressure," and tending to give less consideration to the costs or consequences of a decision.  *Id*. at 251.  In fact, "the prefrontal cortex—the last region of the brain to develop, and the region responsible for risk-weighing and understanding consequences—is not fully developed until age 25."  *Id*., citing National Academies of Sciences, Engineering, and Medicine, *The Promise of Adolescence: Realizing Opportunity for All Youth* (Washington, DC: The National Academies Press, 2019), p 51; Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 449-450, 453-454 (2013).  Research emphasizes that the "susceptibility to peer pressure exacerbates late adolescents' predisposition to risk-taking and deficiencies in decision-making."  *Parks*, 510 Mich at 251, citing Gardner & Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study*, 41 Dev Psychol 625, 629-634 (2005).

Additionally, it is well established that the hallmarks of these late stages of neurological development mean that late adolescents remain "susceptible to change" as

they age, giving this class a heightened capacity for reformation and rehabilitation. *Parks*, 510 Mich at 251-252, citing Aoki, Romeo, & Smith, *Adolescence as a Critical Period for Developmental Plasticity*, 1654 Brain Res 85 (2017); Tanner & Arnett, *The Emergence of "Emerging Adulthood": The New Life Stage Between Adolescence and Young Adulthood*, in *Handbook of Youth and Young Adulthood: New Perspectives and Agendas* (New York: Routledge, 2009), pp 39-42.

This point has been illustrated through analysis of data demonstrating that the likelihood of an individual committing violent or property crimes decreases during their twenties and continues to decline significantly as they age. See Casey et al, *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, 5 Ann Rev Criminology 321, 331-332 (2022) (stating that there is "a transient pattern in criminal behavior that peaks during adolescence and subsides by the mid-twenties" and providing an illustrative age-crime curve graph); The Sentencing Project, *No End in Sight: America's Enduring Reliance on Life Imprisonment* (2021), p 25 (observing that the likelihood of engaging in or being arrested for violent activity follows a "downward slope" during one's mid-twenties and drops off significantly as people continue to age); Insel et al, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers*, Center For Law, Brain & Behavior (2022), p 37 & n 210 (citing several scientific studies to make the same point). There has long been a scientific consensus that, in terms of neurological development, there is "no meaningful distinction" between a 17-year-old and 18-year-old individual. *Parks*, 510 Mich at 252. But the lack of meaningful distinction does not stop at age 18. As one study concluded, "[d]istinguishing the [cognitive] capacity of a 17-year-old from an 18-, 19-, 20-, or 21-

16

year-old would be impossible for a single individual or even group of individuals, but this distinction in performance becomes more obvious by the mid-twenties." *Making the Sentencing Case*, 5 Ann Rev Criminology at 327-328. "Thus, the age at which cognitive ability matures depends on several factors, including the socio-emotional context and cognitive demands of the task." *Id*. at 328.

Stated differently, as a class, 19- and 20-year-old late adolescents are more similar to juveniles in neurological terms than they are to older adults. Although the dissent criticizes our reliance on "a parade of neuroscientific studies," we continue to have an obligation to "consider objective, undisputed scientific evidence when determining whether a punishment is unconstitutional as to a certain class of defendants." *Parks*, 510 Mich at 249. An assessment of the proportionality of our state's harshest punishment imposed on a class of late-adolescent offenders would be incomplete without acknowledgment of the unrebutted scientific consensus that has been presented to the Court.[10] As in *Parks*, our approach in considering such information remains analogous to that of the United States Supreme Court in *Roper*, *Graham*, *Miller*, and *Montgomery*.

---

[10] Of course, scientific evidence is regularly presented in trial court proceedings through qualified expert witnesses. See MRE 701 to MRE 707. In criminal proceedings, we have held that the use of science-based expert testimony is appropriate when the matter at issue is beyond the understanding of the average lay juror. See, e.g., *People v Kowalski*, 492 Mich 106, 128-131; 821 NW2d 14 (2012) (opinion by MARY BETH KELLY, J.) (holding that expert testimony regarding the psychological factors that might cause an individual to falsely confess to a crime is admissible if the requirements of MRE 702 are met). This is also true in the civil context, particularly in medical malpractice litigation where trials often focus on the competing testimony of medical experts. See, e.g., *Stokes v Swofford*, ___ Mich ___; ___ NW3d ___ (July 25, 2024) (Docket Nos. 162302 and 163226) (analyzing the requirement that a plaintiff's physician-standard-of-care expert must have the same relevant specialty as the physician accused of committing medical malpractice). Nothing in MCL 769.25 or MCL 769.25a prevents a prosecutor or a defendant from presenting

17

## B. THE LEGAL RIGHTS OF LATE ADOLESCENTS

Although late adolescents obtain new legal rights upon their eighteenth birthday, in many regards, our society does not recognize these individuals as full adults until age 21. Age-based legal rights are a social and civic recognition that age and maturity generally correlate and that as an adolescent matures, they are expected to take on more social and legal responsibilities. Various laws demonstrate that late adolescents between the ages of 18 and 21 exist within a unique transient phase during which society has decided they are mature enough to hold some but not all of the rights and privileges of full adulthood.

There are several examples in Michigan. The people of Michigan have determined that someone cannot serve as an elected state legislator until reaching "21 years of age." Const 1963, art 4, § 7.[11] People under the age of 21 are also legally prohibited from engaging in many risky or potentially dangerous or addictive activities. State law prevents a person from lawfully purchasing, consuming, or possessing alcohol or recreational cannabis until the age of 21. MCL 436.1109(6); MCL 436.1703(1); MCL 333.27954(1); MCL 333.27955. State law also requires that a person be 21 to obtain a concealed pistol

---

expert testimony during an individualized sentencing hearing or challenging an expert put forward by the opposing party.

[11] One cannot serve as our state's elected governor or lieutenant governor until age 30. Const 1963, art 5, § 22. Article 2, § 1 of the 1963 Michigan Constitution and § 2 of the Fourteenth Amendment of the United States Constitution historically granted voting rights to only individuals aged 21 or older, but these limitations were superseded by the ratification of the 26th Amendment of the United States Constitution in 1971 in response to young adults being drafted and serving in the Vietnam War. See US Const, Am XXVI, § 1 ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").

license.  MCL 28.425b(7)(a).[12]  In Michigan, the right to engage in online gambling, sports betting, and gambling in physical facilities licensed by the Michigan Gaming Control Board is not granted until age 21.  See MCL 432.209(9); MCL 432.403(e).  Nor can a person be appointed as an officer of the Michigan State Police until age 21.  MCL 28.4(4).  Michigan's Legislature has also extended eligibility for the Holmes Youthful Trainee Act (HYTA), MCL 762.11 *et seq*., to encompass adolescents between the ages of 18 and 26, when it previously was limited to ages 17 to 24.  See *Parks*, 510 Mich at 253.  HYTA requires the additional condition of prosecutor consent for eligible individuals who were 21 or older at the time of their offense.  MCL 762.11(1) and (2).

Various federal laws also treat late adolescents as less than a fully mature adult.  For example, among other qualifications, one must be at least age 25 to serve as a member of the House of Representatives, US Const, art I, § 2; at least age 30 to be a member of the Senate, US Const, art I, § 3; and at least age 35 to serve as President or Vice President, US Const, art II, § 1.  A person generally cannot open a credit card until age 21 without a cosigner, 15 USC 1637(c)(8),[13] or obtain an airline pilot transport certificate under certain aeronautical experience requirements, 14 CFR 61.153(a)(1), until age 23.  Additionally, federal firearm licensees are not permitted to sell or transfer a handgun or handgun

---

[12] Although state law generally allows someone to possess a pistol at age 18, their ability to obtain a license to purchase a pistol from a federally licensed seller is restricted to those who are at least 21 years old.  See MCL 28.422(3)(b); 18 USC 922(b)(1) and (c)(1); 18 USC 923.

[13] The cosigner requirement can be waived if the applicant submits documentation "indicating an independent means of repaying any obligation arising from the proposed extension of credit in connection with the account."  15 USC 1637(c)(8)(B)(ii).

ammunition to a person younger than 21. 18 USC 922(b)(1) and (c)(1).[14] Thus, federal law also recognizes that despite having achieved the age of majority, there are numerous rights and privileges that we do not entrust to an 18-year-old.

## C. THE CONSTITUTIONALITY OF MANDATORY LWOP FOR LATE ADOLESCENTS

We apply the *Lorentzen* test, as reaffirmed by *Bullock* and *Parks*, to determine whether mandatory LWOP is grossly disproportionate and thus "cruel or unusual" when applied to late adolescents under the age of 21. Again, the relevant factors are: (1) the severity of the punishment relative to the gravity of the offense, (2) punishments imposed in the same jurisdiction for other offenses, (3) punishments imposed in other jurisdictions for the same offense; and (4) Michigan's traditional goal of and preference for rehabilitation. *Parks*, 510 Mich at 242, citing *Bullock*, 440 Mich at 33-34; *Lorentzen*, 387 Mich at 176-181. Application of the *Lorentzen-Bullock* test leads us to conclude that *mandatorily* sentencing 19- and 20-year-old defendants to die in prison is unusually excessive and constitutionally disproportionate. We therefore extend our holdings from *Parks* and related precedents to this class of late-adolescent defendants.

## 1. SEVERITY OF THE PUNISHMENT AND GRAVITY OF THE OFFENSE

Examining the first *Lorentzen-Bullock* factor, there is no dispute that first-degree premeditated murder is one of the most severe and heinous crimes that a person can

---

[14] A federal court of appeals recently held that this restriction violates the Second Amendment rights of 18-year-old individuals. See *Reese v Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F4th 583 (CA 5, 2025). The ruling in *Reese* conflicts with the judgment of a different federal appellate court upholding a state law prohibiting any person under the age of 21 from purchasing a firearm. See *Rocky Mountain Gun Owners v Polis*, 121 F4th 96 (CA 10, 2024). This circuit split has not been resolved.

commit.[15] Unlike in *Parks*, these defendants were not convicted as aiders and abettors to murder but as the principal offender of each crime. In Czarnecki's case, the prosecution presented evidence that he and his codefendant jointly participated in the robbery and killing of the victim and the later burning of the body. In Taylor's case, the prosecution presented evidence that he entered the victim's home and shot the victim to death without the assistance of others. A jury convicted each defendant, and there is no doubt that a lengthy term of imprisonment is warranted for these heinous crimes. But our analysis does not end here.

We must also assess the severity of the punishment through a lens of proportionality. See *Parks*, 510 Mich at 256-257; *Bullock*, 440 Mich at 40-41. In Michigan—the first state to abolish the death penalty, *Parks*, 510 Mich at 257 n 10—*mandatory* LWOP is the most severe punishment that can be imposed. As we recognized in *Parks*, when LWOP is imposed on late adolescents, "they will inevitably serve more time and spend a greater

---

[15] The immorality of an intentional, unjustified killing of another human being should not be minimized. But contrary to the dissent's suggestion, only one form of first-degree murder requires that the killing be intentional and premeditated. Compare MCL 750.316(1)(a) (describing premeditated murder) with MCL 750.316(1)(b) and MCL 750.316(1)(c). First-degree felony murder, MCL 750.316(1)(b), is "a general intent crime, requiring evidence of one of the three intents necessary to prove second-degree murder," which are "an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with knowledge that the act probably will cause death or great bodily harm." *People v Herndon*, 246 Mich App 371, 386; 633 NW2d 376 (2001) (citation omitted). First-degree murder under MCL 750.316(1)(c) is premised on the killing of a police or correctional officer and requires proof of one of the three intents necessary to prove second-degree murder. *Id*. at 387. Both offenses can exist without a specific intent to kill or premeditation. Rather, state law elevates the crime and the punishment due to other circumstances. Accordingly, a person can be convicted of first-degree murder under MCL 750.316(1)(b) and (c) and thus be subjected to *mandatory* LWOP under circumstances in which no fact-finder has found proof beyond a reasonable doubt of a specific intent to kill or premeditation.

percentage of their lives behind prison walls than similarly situated older adult offenders." *Id*. at 257.

As compared to older offenders, the neuroplasticity of the late-adolescent brain makes this class of defendants uniquely prone to impulsive and reckless decision-making. See Part IV(A) of this opinion; *Parks*, 510 Mich at 258-259. But this is transient. As previously discussed, there is scientific consensus that the late-adolescent brain completes rewiring and maturation during one's mid-twenties. As late adolescents mature into fully developed adults, they become less prone to reckless decision-making, more likely to consider and appreciate consequences, and less susceptible to peer pressure. Like 18-year-olds and their juvenile counterparts, late adolescents are "capable of significant change and a turn toward rational behavior that conforms to societal expectations as their cognitive abilities" fully mature. *Parks*, 510 Mich at 258. See also Part IV(A) of this opinion.

The incredible capacity for change and potential rehabilitation of this class of individuals makes the infliction of *mandatory* LWOP on adolescent offenders particularly cruel. There are no meaningful differences between relevant brain development of late adolescents at age 18, taken as a class, as compared to age 19 or 20. The current "sentencing scheme fails to consider whether any" 19- or 20-year-old defendants "are irreparably corrupt, whether they have the capacity to positively reform as they age, and whether they committed their crime" when they "lacked the capability to fully understand the consequences of their actions." *Id*. at 259. This scheme forecloses a sentencing court from ensuring that the punishment imposed is "tailored to a defendant's personal responsibility and moral guilt." *Bullock*, 440 Mich at 39 (quotation marks and citation omitted). " '[I]t would be profoundly unfair to impute full personal responsibility and

22

moral guilt' to those who are likely to be biologically incapable of full culpability." *Parks*, 510 Mich at 259, quoting *Bullock*, 440 Mich at 39. Accordingly, this factor strongly favors holding that the *mandatory* imposition of LWOP on 19- and 20-year-old defendants without consideration of mitigating factors inherent in one's youth is excessive and disproportionate punishment.

## 2. PUNISHMENTS IMPOSED IN MICHIGAN FOR OTHER OFFENSES

The second *Lorentzen-Bullock* factor requires that we compare the punishment for the crime at issue to the punishment for other crimes. Mandatory LWOP is the harshest punishment in Michigan and can only be imposed for a very limited number of criminal convictions. Michigan law mandates LWOP for adult offenders only if they are convicted of first-degree murder, MCL 750.316(1); habitual repeated sexual assaults of children under age 13, MCL 750.520b(2)(c) and MCL 791.234(6)(e);[16] and a handful of other highly dangerous offenses that endanger many people and result in a death, MCL 791.234(6)(b), (c), (d), and (f).[17] "These crimes all reflect a high degree of moral guilt," *Parks*, 510 Mich at 260, but it is notable that most violent crimes and other forms of homicide are not on this list. For example, MCL 791.234(6) does not include second-

---

[16] MCL 791.234 was amended by 2024 PA 111, effective March 19, 2025, but Subsection (6) remains unchanged.

[17] This last class includes conduct that results in a death following the adulteration or misbranding of drugs with an intent to kill or cause serious bodily impairment, MCL 750.16(5); MCL 750.18(7), and the transport of explosives with an intent to intimidate, injure, or kill, MCL 750.210(e).

degree murder, MCL 750.317; assault with intent to commit murder, MCL 750.83; or most forms of first-degree criminal sexual conduct under MCL 750.520b.[18]

We observed in *Parks* that when an 18-year-old is sentenced to LWOP, "it is highly probable that" they "will spend more time behind prison bars than any other adult defendant convicted of the same crime or similarly severe crimes" and that this result was "disproportionate to other offenders in this state." *Parks*, 510 Mich at 260. This conclusion also holds true for 19- and 20-year-old offenders like Czarnecki and Taylor, who are only slightly older than the defendant in *Parks*. Because of the natural limitations imposed by one's biological lifespan, the actual time served by late-adolescent defendants who are convicted and sentenced to LWOP will often be decades longer than what is served by an older individual convicted of the identical crime.

Given the legal effect of the Supreme Court's decisions in *Miller* and *Montgomery*, under MCL 769.25 and 769.25a, all offenders who will receive or have received a *mandatory* sentence of LWOP for a crime committed before they turned 18 are entitled to a *Miller* hearing. At such hearings, the prosecution is required to overcome a presumption against imposition of LWOP by clear and convincing evidence under our decision in *Taylor*, 510 Mich 112. If the prosecution does not meet its burden, then a term-of-years

_____

[18] As previously discussed, several state statutes and constitutional provisions unrelated to criminal punishment establish a social standard that recognizes full adulthood later than age 18. See Part IV(B) of this opinion. Well-known examples include age restrictions related to purchasing, consuming, or possessing alcohol or recreational cannabis, MCL 436.1109(6); MCL 436.1703(1); MCL 333.27954(1); MCL 333.27955, gambling, MCL 432.209(9); MCL 432.403(e), and obtaining a concealed pistol license, MCL 28.425b(7)(a).

sentence must be imposed, for which the minimum will be 25 to 40 years, and the maximum will be not less than 60 years.[19] MCL 769.25(9); MCL 769.25a(4)(c).

Under the current scheme post-*Parks*, Czarnecki and Taylor would spend more time in prison than many equally culpable older offenders. A late adolescent who is sentenced to LWOP and lives to be 70 would serve approximately five decades in prison, but an equally culpable individual who receives LWOP for a crime committed in their forties or fifties would serve a fraction of that time if they live to the same hypothetical age. Czarnecki and Taylor would also spend significantly more time in prison than most equally culpable juvenile and 18-year-old offenders under the current scheme. Most juvenile and 18-year-old offenders who are convicted of first-degree murder will receive the minimum sentence between 25 and 40 years, after which they will become eligible for parole consideration.[20]

---

[19] Our decision in *Parks*, 510 Mich 225, extended these requirements to all future convictions of 18-year-old offenders. And given our holding in *Poole*, ___ Mich at ___; slip op at 1, 17—that *Parks* applies retroactively to cases on collateral review—all 18-year-old offenders who were previously convicted and sentenced to mandatory LWOP will also be entitled to a *Miller* hearing if a prosecutor seeks reimposition of an LWOP sentence.

[20] Additional disparities in actual time served can arise from the plea-bargain process. For example, Czarnecki's codefendant, who appears to have been equally culpable under the evidence presented by the prosecution, pleaded guilty to second-degree murder and received a minimum sentence of 18 years. See note 1 of this opinion; *Czarnecki*, unpub op at 2 n 2. We note that a 2021 report found that from 1999 to 2012, the median minimum sentence imposed for second-degree murder within the sample group was 20 years for nonhabitual offenders and $31^1/_2$ years for habitual offenders. Levin, Mahar & Smith, *Do Michigan's Sentencing Guidelines Meet the Legislature's Goals?*, p 50, Table 4, Safe & Just Michigan (Nov 2021) <https://safeandjustmi.org/2021/12/10/sjm-report-do-michigans-sentencing-guidelines-meet-the-legislatures-goals-a-historical-and-empirical-analysis-of-prison-terms-for-life-maximum-offenses/> (accessed March 31, 2025) [https://perma.cc/Y3DB-5J3Y]; see also *id*. at 104, Table 17.

The second *Lorentzen-Bullock* factor favors a finding that imposition of mandatory LWOP on 19- and 20-year-olds without an individualized assessment is constitutionally defective.

### 3. PUNISHMENTS IMPOSED IN OTHER JURISDICTIONS FOR THE SAME OFFENSE

The third *Lorentzen-Bullock* factor, which requires that we examine punishments imposed in other jurisdictions for the same offense, also weighs in favor of requiring individualized sentencing before a sentence of LWOP can be imposed on a 19- or 20-year-old defendant. When we decided *Parks*, "25 states and the District of Columbia [did] not legislatively *mandate* life without parole for equivalent first-degree murder, regardless of the age of the offender," *Parks*, 510 Mich at 262 & n 15, and six other states mandated LWOP for equivalent first-degree murder only "when there [were] proven aggravated circumstances," *id*. at 263 & n 16. We also noted that the Washington Supreme Court had recently held that its state constitution required individualized sentencing protections before LWOP could be imposed against anyone convicted of a crime before age 21. *Id*. at 263, citing *In re Personal Restraint of Monschke*, 197 Wash 2d 305; 482 P3d 276 (2021).[21]

---

[21] Washington's constitution prohibits "cruel punishment." Wash Const 1889, art 1, § 14. The Washington Supreme Court concluded that

> *no meaningful neurological bright line exists between age 17 and age 18 or, as relevant here, between age 17 on the one hand, and ages 19 and 20 on the other hand.* Thus, sentencing courts must have discretion to take the mitigating qualities of youth—those qualities emphasized in *Miller*[, 567 US 460,] and [*State v*] *Houston-Sconiers*[, 188 Wash 2d 1; 391 P3d 409 (2017)]—into account for defendants younger and older than 18. *Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will.* We leave it up to sentencing courts to determine which individual defendants merit leniency for these characteristics. Our aggravated murder statute's requirement of LWOP for *all* defendants 18 and

26

Soon after *Parks* was decided, the Supreme Judicial Court of Massachusetts held that its state constitution prohibited application of *mandatory* LWOP to anyone under the age of 21 at the time of their criminal offense.[22]

In *Parks* we noted that Michigan was among a "minority of states that legislatively *mandate*[*d*]" LWOP for all individuals convicted of a first-degree murder committed after reaching the age of 17, *Parks*, 510 Mich at 263 (emphasis added), and we abolished *mandatory* LWOP for 18-year-old offenders convicted of first-degree murder. The previously summarized statistics are the same as applied to 19- and 20-year-old defendants convicted of first-degree murder.[23] In addition to the *Mattis* decision, after *Parks* was

---

older, regardless of individual characteristics, violates the state constitution. [*In re Personal Restraint of Monschke*, 197 Wash 2d at 326 (emphasis added).]

[22] Massachusetts's constitution prohibits courts from inflicting "cruel or unusual punishments." Mass Const, art 26. The Supreme Judicial Court of Massachusetts concluded:

> Life without parole for emerging adults violates art. 26 [of the Massachusetts constitution]. Our comprehensive review informs us that Supreme Court precedent, as well as our own, dictates that youthful characteristics must be considered in sentencing, that the brains of emerging adults [i.e., those from 18 to 20 years of age] are not fully developed and are more similar to those of juveniles than older adults, and that our contemporary standards of decency in the Commonwealth and elsewhere disfavor imposing the Commonwealth's harshest sentence on this cohort. Consequently, we conclude that a sentence of life without the possibility of parole for emerging adult offenders violates art. 26. [*Mattis*, 493 Mass at 234-235.]

[23] We note that there is a distinction between the 25 states listed in *Parks* and the 22 states listed in *Mattis*. The *Mattis* decision omitted New Jersey, West Virginia, and Virginia. In *Parks*, we discussed "equivalent first-degree murder," *Parks*, 510 Mich at 263, whereas the *Mattis* court was focused on states that never mandated LWOP "in any circumstance," *Mattis*, 493 Mass at 233. There are some circumstances in which LWOP is mandated under New Jersey law, NJ Stat Ann 2C:11-3(b)(1) to (4), and Virginia law, VA Code Ann 18.2-31;

issued, the Illinois Legislature substantially revised its parole-eligibility statutes. Under the current version of 730 Ill Comp Stat 5/5-4.5-115(b), most individuals serving a sentence for first-degree murder committed before the age of 21 are eligible for parole consideration after 20 years. Those who were sentenced to a "term of natural life imprisonment" are eligible for parole review after 40 years. *Id*.

When *Parks* was decided, only Michigan, 17 other states, and the federal government *mandated* LWOP as the punishment for equivalent premeditated first-degree murder committed by a person who was 18 or older. *Parks*, 510 Mich at 263-264, 263 n 17, 264 n 18. These legislatively mandated punishments remain intact except as to Massachusetts. Given the ruling in *Mattis*, 493 Mass at 234-235 (invalidating *mandatory* LWOP for defendants under the age of 21), only 16 other states now mandate LWOP for equivalent first-degree murder.[24] Michigan thus remains a notable outlier at a national level when it comes to the imposition of *mandatory* LWOP as a punishment.[25]

---

VA Code Ann 18.2-10(a). However, the premeditated killings at issue in *Parks* and in these cases would not fall under those limited groupings. Additionally, although life imprisonment is mandatory for first-degree murder under West Virginia law, W Va Code, 61-2-1; W Va Code, 61-2-2, the possibility of parole is generally available under W Va Code, 62-12-13(c).

[24] We also note that Hawaii obligates the parole board to submit an application to its governor to commute an LWOP sentence to one permitting parole after 20 years. Haw Rev Stat 706-656. As in Michigan, Const 1963, art 5, § 14, Iowa law allows the governor to commute the sentence to a term of years. Iowa Code 902.2.

[25] The dissent criticizes our focus on Michigan's outlier status because, unlike in *Bullock* and *Lorentzen*, our state was "alone—or nearly alone—in imposing a uniquely harsh penalty," but that simply suggests that those were easier cases. At what point does being among a significant minority of jurisdictions that impose a punishment make the punishment unusually harsh for constitutional purposes? We find it significant that 66% of states do not *mandate* LWOP as a punishment for equivalent first-degree murder.

As the United States Supreme Court has done before, see *Graham*, 560 US at 80, we also find it relevant to look beyond the borders of the United States when considering whether a punishment is cruel or unusual. In the United Kingdom, the imposition of LWOP for anyone under the age for 21 at the time of the offense has been unlawful since at least 2020. Sentencing Act 2020, c 17, § 322, sch 21, ¶¶ 2 to 3 (UK) (providing a 30-year minimum term for individuals between the age of 18 and 21 at the time a serious offense was committed). In 2022, the Supreme Court of Canada held that all sentences of imprisonment for life without a realistic possibility of parole were unconstitutional for all convicted offenders, *regardless of their age. R v Bissonnette*, 2022 SCC 23 (Can).[26] These legislative and judicial decisions suggest that the United States is becoming more of an

---

[26] The Supreme Court of Canada specifically held that "[a] sentence of imprisonment for life without a realistic possibility of parole is intrinsically incompatible with human dignity," that its Charter requires Parliament to allow for rehabilitation, and that such punishment is cruel and unusual. *Bissonnette*, 2022 SCC 23 (Can), ¶¶ 7 to 9, 81.

The United States' use of LWOP as a punishment also remains an outlier when compared with other United Nations members. As of fall 2022, 155 of the 193 United Nations member states prohibited LWOP sentences. Law, *Prisoner Advocates Turn to the UN to End Extreme Prison Sentences*, The Nation (September 15, 2022) <https://www.thenation.com/article/society/extreme-prison-sentences-united-nations/> (accessed February 28, 2025) [https://perma.cc/DUZ8-LY72]. "In Europe, only 10 countries permit sentences of life without parole; in Latin America, only four countries still mete out life without parole." *Id*. In 2023, the United Nations Human Rights Committee reaffirmed its previous recommendation that the United States "prohibit and abolish sentences of life imprisonment without parole for juveniles" and further recommended "establishing a moratorium on the imposition of sentences of life imprisonment without parole." United Nations International Covenant on Civil and Political Rights, Human Rights Committee, *Concluding Observations on the Fifth Periodic Report of the United States of America* (December 7, 2023), p 12 (bold typeface omitted), available at <https://docs.un.org/en/CCPR/C/USA/CO/5>.

outlier among the developed world in its use of mandatory imprisonment for life as a punishment.

The national and international trends concerning the punishment of late adolescents convicted of heinous crimes illustrate that the "evolving standards of decency that mark the progress of a maturing society," *Lorentzen*, 387 Mich 179, are trending away from the imposition of mandatory LWOP for late adolescents.[27] Mandatory LWOP is "an irrevocable sentence, offering no hope of release, for a group of defendants that are neurologically less culpable than others serving the same or, oftentimes, less-severe sentences for the same crimes." *Parks*, 510 Mich at 264. The imposition of such punishment on late adolescents who were 19- or 20-years-old at the time of their offense does not comport with our Constitution's mandatory prohibition on excessively harsh, and thus cruel or unusual, punishment.[28] Const 1963, art 1, § 16.

## 4. MICHIGAN'S TRADITIONAL GOAL OF AND PREFERENCE FOR REHABILITATION

The final proportionality factor we must consider under *Lorentzen-Bullock* is Michigan's longstanding goal of and preference for punishments that allow for

---

[27] As discussed in Part IV(B) of this opinion, various federal laws also grant late adolescents less than the full rights of adulthood. For example, federal firearm licensees are not permitted to sell or transfer a handgun or handgun ammunition to a person under 21. 18 USC 922(b)(1) and (c)(1).

[28] We recognized in *Parks* that this factor is "more neutral than the first two," but that it "slightly weighs in favor of an individualized sentencing procedure . . . ." *Parks*, 510 Mich at 262. We continue to acknowledge that this factor is less clear than the other factors. However, considering judicial decisions in other jurisdictions that predated *Parks* and that have been issued after *Parks*, we find this factor now more strongly supports our holding that the punishment at issue is cruel or unusual.

30

rehabilitation. "[I]t cannot be disputed that the goal of rehabilitation is not accomplished by mandatorily sentencing an individual to life behind prison walls without any hope of release." *Parks*, 510 Mich at 264-265. As we have previously noted, rehabilitation "is the only penological goal enshrined in our proportionality test as a 'criterion rooted in Michigan's legal traditions.' " *Id*. at 265, quoting *Bullock*, 440 Mich at 34.

The evolution of Michigan's constitutional text illustrates the point. Michigan's first Constitution, adopted in 1835, provided that "cruel and unjust punishments shall not be inflicted." Const 1835, art 1, § 18. Fifteen years later, not only was "unjust" replaced with "unusual," but the broader disjunctive "or" replaced the conjunctive "and." Const 1850, art 6, § 31.[29] This change was introduced by Judge (later Justice) Benjamin Witherell, and while there was not detailed debate, much can be gleaned as to the prevailing views on rehabilitation from the vigorous debates surrounding a proposed disenfranchisement clause, which would have prohibited citizens convicted of crimes from voting.

---

[29] This amendment came a mere three years after Michigan's abolition of the death penalty except in cases of treason, and that exception was never used. Shapiro & Bernstein, *The Meaning of Life, In Michigan: Mercy from Life Sentences Under the State Constitution*, unpublished manuscript (November 22, 2024), p 4, available at <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4993230>, citing Galliher et al, *America Without the Death Penalty*, Northeastern University Press (2005), p 5. When the legislative abolition of the death penalty was later constitutionalized, Delegate T. Jefferson Hoxie, as chairman of the committee on legislative powers, argued on behalf of the committee that it was "fitting and opportune for Michigan to step forward in the tradition which we began over 115 years ago" as the "first American state and the first governmental jurisdiction in the English speaking world to legislate against capital punishment." 1 Official Record, Constitutional Convention 1961, p 595.

Witherell explained that "there were two reasons for inflicting punishment—warning to the community and reformation of the offender." Report of the Proceedings and Debates in the Convention to Revise the Constitution of the State of Michigan 1850, p 298. Numerous other delegates agreed. While the historical record lacks explicit debate on the convention's adoption of "cruel or unusual" language, delegate statements on the disenfranchisement provision show that the potential for reformation following criminal conviction was a foundational concern among state leaders. See Shapiro & Bernstein, *The Meaning of Life, In Michigan: Mercy from Life Sentences Under the State Constitution*, unpublished manuscript (November 22, 2024), pp 5-6, available at <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4993230>.

Historical practices in Michigan demonstrate a firm commitment to rehabilitation. From 1840 to 1865, the Governor's pardon power was exercised regularly and "served as a sentence-review mechanism that prioritized rehabilitation over finality," even for life sentences, with data suggesting that the power was often exercised to release the elderly or infirm. *Id*. at 7-12. Michigan was one of the first states in the country to formally create a parole board, 1895 PA 218, §§ 1 and 2, which was based on the systematic use of the pardon power by the Governor. *The Meaning of Life, In Michigan*, p 7.

As early as 1888, this Court "foreshadowed modern *constitutional* proportionality analysis," *Bullock*, 440 Mich at 36 n 18, when it held in *People v Murray*, 72 Mich 10, 17; 40 NW 29 (1888), that a term-of-years sentence should "never be made to extend beyond the average period of persons in prison life, which [at that time] seldom exceed[ed] 25 years." Then, in 1902, voters approved a ballot proposal to constitutionalize the Legislature's authority to enact an indeterminate sentencing system and to provide for

parole.  See Const 1850, art 4, § 47.  This Court soon observed that the indeterminate amendment was designed "to reform criminals and to convert bad citizens into good citizens, and thus protect society."  *People v Cook*, 147 Mich 127, 132; 110 NW 514 (1907).  "In order to accomplish this result, the theory is that, when the prisoner has shown by his conduct that he may turn from his criminal career, he should have an opportunity, under favorable circumstances, to make the test."  *Id*.

From 1900 to 1969, 57% "of all people sentenced to life without parole for first-degree murder convictions were released after an average of fewer than twenty-four years in prison."  *The Meaning of Life, In Michigan*, p 17.  Across that same period, "sentences of life with the possibility of parole typically led to about sixteen years of incarceration."  *Id*.  Some of this was due to the widespread application of good-time credits, at least until those credits were effectively eliminated in 1978.  See 1978 IL B, effective December 12, 1978; MCL 800.33, as amended by 1982 PA 442.

The historical record demonstrates that a person's potential for rehabilitation and reentry into society has long played a unique and heighted role in Michigan.[30]  Mandatorily

_____

[30] Although we acknowledge that other goals of criminal punishment include deterrence, public safety, and retribution, the goal of rehabilitation has heightened importance in Michigan as it is the only penological aim expressly incorporated into our test for constitutional proportionality.  Individualized lengthy criminal sentences for heinous crimes can promote public safety and achieve retribution.  We also note that "[s]tudy after study . . . has shown that people do not order their unlawful behavior around the *harshness* of sentences they may face, but around their perceived likelihood of being caught and facing *any* sentence."  Nelson, Feineh, & Mapolski, *A New Paradigm for Sentencing in the United States*, p 23, Vera Institute of Justice (Feb 2023) <https://vera-institute.files.svdcdn.com/production/downloads/publications/Vera-Sentencing-Report-2023.pdf> (accessed March 25, 2025) [https://perma.cc/JS9H-UVHS]; see also Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just 199, 199 (2013) (noting that "lengthy prison sentences and mandatory minimum sentencing cannot be justified on deterrence").  Given these findings and the known impulsivity of late adolescents, one

eliminating the possibility of rehabilitation and reentry into society is exceptionally cruel when applied to late adolescents whose "rehabilitative potential is quite probable" given the stage of their cognitive development. *Parks*, 510 Mich at 265. As in *Parks*, we conclude that it would be "antithetical to our Constitution's professed goal of rehabilitative sentences" to *deny all* 19- and 20-year-old individuals who commit first-degree murder *any possible opportunity* to rehabilitate themselves and reenter society without requiring an individualized sentencing proceeding at which relevant mitigating characteristics of youth can be evaluated by the sentencing court. *Id*. See also MCL 769.25; MCL 769.25a.

### D. THE CONTINUED VIABILITY OF *PEOPLE v HALL*

We also directed the parties to address whether extending *Parks* to the class of 19- and 20-year-old offenders required us to overrule *Hall*, 396 Mich at 657-658, and if so, whether we should do so. The defendant in *Hall* was sentenced to a mandatory term of LWOP for a felony murder committed when he was 17 years old. *Hall* rejected the defendant's argument that imposition of LWOP was unconstitutional under either US Const, Am VIII, or Const 1963, art 1, § 16. *Hall*, 396 Mich at 657-658.

There are numerous reasons to question the continued viability of *Hall* as binding precedent concerning constitutionally permissible punishments. We note that the *Hall* opinion did not refer to the defendant's age and that the defendant did not appear to argue his age as a foundation for his argument that automatic LWOP constituted "cruel and unusual" punishment, US Const, Am VIII, or "cruel or unusual" punishment, Const 1963, art 1, § 16. The defendant in *Hall* made a facial constitutional challenge to the validity of

---

cannot reasonably know how effective the length of possible punishment is in deterring youthful criminal conduct.

LWOP as a punishment for felony murder regardless of one's age. However, given Hall's age (17), any federal constitutional basis for the Eighth Amendment ruling in *Hall* has been effectively repudiated by *Miller* and *Montgomery*.[31]

Given that *Hall* was issued in 1976, it also predated decades of significant changes in state and federal law concerning the constitutionality of punishments that can be constitutionally imposed on juveniles and late adolescents. See *Roper*, 543 US at 560, 578-579; *Graham*, 560 US at 74-75, 82; *Miller*, 567 US at 479-480, 489; *Montgomery*, 577 US at 212-213; *Parks*, 510 Mich at 268. The *Hall* Court had neither the benefit of these later decisions nor access to the more recent scientific understanding of how the adolescent brain functions.

As an additional matter, *Hall* was based, in part, on the notion that the Governor could potentially commute an LWOP sentence. *Hall*, 396 Mich at 658. But shortly after *Hall* was issued, the United States Supreme Court rejected this idea, noting that "the possibility of executive clemency that exists in every case" is not significant for purposes of an Eighth Amendment analysis because it would make such judicial review "meaningless." *Solem v Helm*, 463 US 277, 303; 103 S Ct 3001; 77 L Ed 2d 637 (1983). *Solem* thus calls into question the reliance in *Hall* on the potential for a commutation by Michigan's Governor as a part of this Court's Eighth Amendment analysis.

In terms of purely state law, the *Hall* decision included an analysis of the *Lorenzten* factors. However, the truncated analysis provided in *Hall* would not pass current judicial

---

[31] In fact, Hall himself has since been resentenced to serve a term-of-years sentence. See Third Judicial Circuit of Michigan, *Register of Actions* (Case No. 67-134610), available at <https://cmspublic.3rdcc.org> (search under "John Sam Hall") (accessed March 13, 2025).

35

muster.  The *Hall* Court performed its analysis through the lens of a "shock the conscience" standard that we later abandoned in *People v Milbourn*, 435 Mich 630, 634-635; 461 NW2d 1 (1990).  *Hall* was also decided before we affirmatively held in *Bullock*, 440 Mich at 27-36, that the "cruel *or* unusual" punishment clause in Const 1963, art 1, § 16, was more protective than the Eighth Amendment and that all criminal sentences must be reasonable and proportionate to the offense and the offender, *id*. at 37-40.

We question how much of *Hall*'s analysis remains viable given the sea change of federal and state precedent interpreting US Const, Am VIII, and Const 1963, art 1, § 16, since *Hall* was decided.  But we need not overrule that decision today.  As we noted in *Parks*, 510 Mich at 255 n 9, when rejecting the facial challenge in *Hall*, the Court "did not address the issue of sentencing a *juvenile* to life without parole"; "*Hall* was decided before the United States Supreme Court decided *Miller* and its progeny"; and "the *Hall* Court did not have the benefit of the scientific literature cited in [*Parks*]."  We found *Hall* inapplicable to an "as applied" constitutional challenge to the imposition of *mandatory* LWOP on a juvenile.  For the same reasons, *Hall* is also inapplicable to an as-applied challenge brought by the class of 19- and 20-year-old defendants who have been sentenced to a mandatory term of LWOP.  We do not disturb, at this time, *Hall*'s holding that Const 1963, art 1, § 16 permits a mandatory punishment of LWOP for defendants convicted of first-degree murder, so long as the defendant was at least 21 years of age at the time of the offense.

## V. APPLICATION

Czarnecki was 19 years old when he committed the premediated murder for which he was convicted. Taylor was 20 years old when he committed the premeditated murder for which he was convicted. Both defendants were subject to the mandatory sentence of LWOP that attaches to first-degree murder under MCL 750.316. Neither defendant was provided the benefit and protections of the specialized procedures mandated by MCL 769.25 or MCL 769.25a despite being members of a class who are presumptively neurologically indistinguishable from either a teenage juvenile offender or an 18-year-old offender. Nor did either defendant receive the benefits of our decisions in *Taylor*, 510 Mich at 138-139, and *Boykin*, 510 Mich at 189, 190-194. Accordingly, the procedures used at Czarnecki's and Taylor's sentencing hearings violated our Constitution, and both are entitled to resentencing.

In *People v Poole*, ___ Mich ___, ___; ___ NW3d ___ (April 1, 2025) (Docket No. 166813); slip op at ___, we held that *Parks* applies retroactively to criminal cases on collateral review. Although these cases are before the Court on direct review, the *Poole* retroactivity analysis applies with equal force to this decision. There is no logical justification for applying *Parks* retroactively to cases on collateral review and not doing the same for the holding reached in these cases involving 19- and 20-year-olds. Therefore, our decision in these cases applies retroactively to cases on collateral review.

## VI. CONCLUSION

We hold that the application of a *mandatory* sentence of LWOP under MCL 750.316 to Czarnecki and Taylor constitutes unconstitutionally harsh and disproportionate punishment and thus "cruel" punishment in violation of Const 1963, art 1, § 16. See *Parks*,

37

510 Mich at 268; *Lorentzen*, 387 Mich at 176-181; *Bullock*, 440 Mich at 33-34. This renders Czarnecki's and Taylor's automatic and mandatory sentences of LWOP unconstitutional, and both defendants are entitled to resentencing.

Therefore, we reverse the Court of Appeals' opinion on remand in each case, vacate each defendant's sentence for first-degree murder, and remand each case to the appropriate circuit court for resentencing in accordance with MCL 769.25, this opinion, and our relevant caselaw. If the prosecutor in either case intends to move for the imposition of an LWOP sentence, then the prosecutor shall have 90 days from the date of this opinion to file such a motion. MCL 769.25(3). Otherwise, each defendant will be resentenced to a term of years, pursuant to MCL 769.25(9). We deny leave to appeal in all other respects for failure to persuade the Court of need for review.[32]

This decision also applies retroactively to all relevant criminal cases on collateral review.

Elizabeth M. Welch
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden
Kimberly A. Thomas

---

[32] Czarnecki filed a Standard 4 brief pursuant to Administrative Order 2004-6, 471 Mich c (2005), in which he sought to raise numerous additional legal challenges. Most, if not all, of these issues are not properly before the Court because defendant raised them before the previous remand and this Court has already denied leave to appeal. See *People v Czarnecki*, 510 Mich 1093 (2022). To the extent Czarnecki presents new legal challenges, we are not persuaded that the questions presented should be reviewed by this Court.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                         No. 166428

MONTARIO MARQUISE TAYLOR,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                         No. 166654

ANDREW MICHAEL CZARNECKI,

      Defendant-Appellant.

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

This Court once again draws a bright line in determining when the imposition of a mandatory life without possibility of parole sentence is unconstitutional under our state Constitution's "cruel or unusual punishment" provision, Const 1963, art 1, § 16. In *People v Parks*, 510 Mich 225, 268; 987 NW2d 161 (2022), we drew the line at 18, and today we extend that holding to include those under the age of 21 at the time they committed their offenses.

I write separately to express my reasons for disagreeing with a bright-line rule drawn at age 21: first, I once again highlight the problem of underinclusiveness that is associated

with drawing a bright-line rule; and second, if drawing any line were necessary, I would instead follow the consensus of the relevant scientific studies and draw such a line at age 25.

In *Parks*, I wrote separately to note that "having a line in place does not mean that such a line should represent both the floor and ceiling of constitutional protections, especially when we already understand that such a line might not be sufficiently protective." *Parks*, 510 Mich at 275 (BERNSTEIN, J., concurring).

> To avoid these downfalls, we could instead consider that all offenders ages 18 and younger have an irrebuttable presumption of youth and diminished capacity, as recognized by the majority opinion. Because the presumption is irrebuttable, all offenders within this class [would] be afforded the processes outlined in MCL 769.25 before they [could] be sentenced to life imprisonment without the possibility of parole. However, we could enable defendants who are older than 18 to assert that they possess some qualities—such as an intellectual disability or other mitigating circumstances—that render their brains more like someone who is age 18 or younger. In other words, once offenders reach the age of 19, the irrebuttable presumption of youthfulness would transform into a *rebuttable* presumption of *maturity* and a defendant over the age of 18 would bear the burden of demonstrating the need for a hearing to ensure that a sentence of life without the possibility of parole was proportionate. I believe that the additional process associated with a shifting presumption rather than a bright line would help to alleviate the problem associated with drawing a line that we know will be, at least in part, underinclusive. [*Id*. at 276-277.]

I continue to believe that the better approach to the difficult problems posed in these cases is one that would allow for a shifting age-based presumption that could consider individual characteristics of diminished culpability. Because these cases do not present us with the opportunity to consider such an option, I largely concur with the majority's analysis and conclusion, as I did in *Parks*.

However, the scientific studies that serve as the foundation for our holdings both in these cases and in *Parks* indicate that they would apply to a group larger than those under

the age of 21, as the majority opinion recognizes. *Parks*, 510 Mich at 250-251 (opinion of the Court) ("This process of brain rewiring means that young adults have yet to reach full social and emotional maturity, given that the prefrontal cortex—the last region of the brain to develop, and the region responsible for risk-weighing and understanding consequences—is not fully developed until age 25.").

The majority here nonetheless draws the line at 21, reasoning that because the defendants in the cases before us were age 19 and 20 at the time they committed their crimes, "resolution of the issues before the Court does not require us to consider whether Const 1963, art 1, § 16 would require granting the same relief to late adolescents who were 21 or older at the time of their offense." However, this Court recently denied leave in a case involving a defendant who was 21 at the time he committed his crime. *People v Adamowicz*, 513 Mich 869 (2023). In light of our decision to limit the class of defendants before us in these cases, it is difficult to read our holding today as anything but closing the door on extending *Parks* relief to other late adolescents. I would instead follow the thoughtful conclusions of the many scientific studies presented before us and relied upon in both *Parks* and these cases, and hold that the turning point for any test, be it a bright-line rule or a shifting age-based presumption, starts at age 25 and not age 21.

Richard H. Bernstein

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                        No. 166428

MONTARIO MARQUISE TAYLOR,

       Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                        No 166654

ANDREW MICHAEL CZARNECKI,

       Defendant-Appellant.

_____

CLEMENT, C.J. (*dissenting*).

In my dissent in *People v Parks*, 510 Mich 225, 298-299; 987 NW2d 161 (2022) (CLEMENT, J., dissenting), I cautioned that this Court's decision to extend *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), beyond its constitutional bounds would not be the last step in its march. Today, the Court takes another two steps, pushing *Parks* past 18-year-olds to 19- and 20-year-olds. The Michigan Constitution's prohibition on "cruel or unusual punishment" does not compel this result. Therefore, I dissent.

The facts are not in dispute. Defendants Andrew Czarnecki and Montario Taylor committed first-degree murders when they were 19 and 20 years old, respectively. Czarnecki and an accomplice killed a man before burning his body, while Taylor killed a man by shooting him eight times. They were both sentenced to mandatory life imprisonment without eligibility for parole (LWOP), as is required under MCL 750.316.[1] They now contend that *Parks*, which held that mandatory LWOP was unconstitutional as applied to defendants who were 18 years old at the time of the commission of the crime, *Parks*, 510 Mich at 268 (opinion of the Court), should be extended to defendants who were 19 and 20 years old at the time of the commission of the crime.

## I. ANALYSIS

The Eighth Amendment of the United States Constitution forbids "cruel *and* unusual punishments." US Const, Am VIII (emphasis added). Article 1, § 16 of the Michigan Constitution prohibits "cruel *or* unusual punishment." Const 1963, art 1, § 16 (emphasis added). That the Michigan Constitution uses "or" rather than "and" has led this Court to interpret Michigan's provision as offering broader protection. *People v Bullock*, 440 Mich 15, 30-33; 485 NW2d 866 (1992).

Even so, we start from the presumption that a statute is constitutional "unless the contrary clearly appears[.]" *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). Furthermore, "every possible presumption" must favor the statute's constitutionality so long as that presumption is not "clearly inconsistent" with the law itself. *Id*. That principle

---

[1] MCL 750.316(1) ("[A] person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole . . . .").

2

carries special weight when it comes to sentencing. As Michigan courts have long held, "[l]egislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011), citing *People v Williams*, 189 Mich App 400, 404; 473 NW2d 727 (1991).

In *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), and later in *Bullock*, 440 Mich at 33-34, this Court set out a four-part test for determining whether a sentence violates Const 1963, art 1, § 16. That test requires us to consider: (1) the severity of the sentence compared to the gravity of the offense, (2) the penalty for the offense compared to penalties for other offenses in Michigan, (3) the penalty for the offense in Michigan compared to the same offense in other states, and (4) whether the penalty serves the penological goal of rehabilitation. *People v Carp*, 496 Mich 440, 520; 852 NW2d 801 (2014), cert gtd and opinion vacated on other grounds sub nom *Carp v Michigan*, 577 US 1186 (2016), citing *Bullock*, 440 Mich at 33-34, and *Lorentzen*, 387 Mich at 176-181. If most of the factors support a finding of constitutionality, the punishment is upheld. See *Carp*, 496 Mich at 521. I address each factor in turn.

### A. THE GRAVITY OF THE OFFENSE VERSUS THE SEVERITY OF THE PUNISHMENT

First, we look to the gravity of the offense and compare it to the severity of the punishment. *Id*. at 520. First-degree murder is arguably the gravest offense under Michigan law. The premeditated taking of a life is an act of the highest moral and legal consequence. A punishment of great severity is therefore proportionate. Mandatory

LWOP is precisely that: the most severe sentence Michigan law allows. And as this Court explained in *Carp*, 496 Mich at 514-515:[2]

> [F]irst-degree murder is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan—the premeditated taking of an innocent human life. It is, therefore, unsurprising that the people of this state, through the Legislature, would have chosen to impose the most severe punishment authorized by the laws of Michigan for this offense.

See also *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976) (stating that mandatory LWOP for felony murder was proportionate to the crime). Because the gravity of the punishment fits the gravity of the offense, the sentence is commensurate.

The majority goes on to note though that younger offenders will spend more time in prison than older offenders.[3] Additionally, the majority states that younger offenders are still neurologically developing and, thus, more impulsive, but that they will eventually mature; therefore, the majority argues that it is particularly cruel to impose mandatory LWOP on younger adults. In other words, the majority does not analyze this first proportionality factor based primarily on the *offense* committed, but on the *offender* who committed it. While I recognize that it makes some sense to consider characteristics of the

---

[2] Though in *People v Poole*, ___ Mich ___; ___ NW2d ___ (April 1, 2025) (Docket No. 166813), the Court overruled *Carp*'s analysis regarding the retroactivity of *Miller* under state law, *Carp*'s holding that the imposition of LWOP on a juvenile offender does not violate Const 1963, art 1, § 16 still stands. While that holding does not specifically address *mandatory* LWOP for young adults, I find that much of *Carp*'s reasoning is generally applicable to the similar issue here.

[3] *Ante* at 21-22 ("As we recognized in *Parks*, when LWOP is imposed on late adolescents, 'they will inevitably serve more time and spend a greater percentage of their lives behind prison walls than similarly situated older adult offenders.' "), quoting *Parks*, 510 Mich at 257 (opinion of the Court).

4

offender in an as-applied challenge, such as that here, I believe the majority unjustifiably allows such considerations to loom so large in its analysis that the majority downplays the gravity of first-degree murder.[4]

Outside of simply overemphasizing the characteristics of the offender, I take further issue with the majority's additional considerations. First, regarding the majority's point that younger offenders, as a practical matter, will spend more time in prison than older offenders, prior to *Parks*, this Court had never before used such reasoning to invalidate life sentences. In *Parks*, I rejected this argument outright:

> When appellants fairly frequently contend that their term-of-years sentence is a de facto life sentence because of their more advanced age, our Court and the Court of Appeals routinely reject such arguments. I see no reason why, in that scenario, we would refuse to consider that a term-of-years sentence is a de facto life sentence but, in the instant case, we would consider—relatedly but in reverse—that a particular life sentence is a de facto longer term-of-years sentence than other life sentences. [*Parks*, 510 Mich at 286 (CLEMENT, J., dissenting).]

In other words, a 70-year-old sentenced to 50 years' imprisonment will almost certainly die in prison. Yet courts have consistently rejected the argument that such a sentence constitutes de facto LWOP, refusing to substitute actuarial projections for the Legislature's

---

[4] I also question whether focusing more on the characteristics of the offender rather than the gravity of the offense itself is inconsistent with how this Court had traditionally analyzed the first factor prior to *Parks*. Compare *Commonwealth v Mattis*, 493 Mass 216, 274-275; 224 NE3d 410 (2024) (Lowy, J., dissenting) (recounting that under Massachusetts' common law, courts consider similar challenges to the constitutionality of punishments under a "tripartite analysis," the first factor of which "requires . . . an 'inquiry into the nature of the offense *and the offender* in light of the degree of harm to society' ") (emphasis added; quotation marks and citation omitted), quoting *Commonwealth v Sharma*, 488 Mass 85, 89; 171 NE3d 1076 (2021). In *Carp*, for instance, though the Court recognized the characteristics of youth, the Court still focused primarily on the serious nature of the offense. See *Carp*, 496 Mich at 514-515.

judgment.[5]  But now, the majority seemingly reverses course, treating realities that turn on actuarial life expectancy as a constitutional bar to mandatory LWOP.

Regarding the majority's second point that younger offenders are still developing neurologically, I do not disagree.  It is common sense that 20-year-olds have not reached full maturity.  For this reason, it is up to the Legislature to amend the relevant statutes to prohibit mandatory LWOP for 19- and 20-year-old offenders.  However, it is one thing for scientific evidence to justify a change in policy from the Legislature, and another thing for that same evidence to support a judicial finding that mandatory LWOP violates our Constitution.  The bar for the latter is much higher, and I do not believe it has been met.  For the judiciary's purposes, the question is not just whether young adults differ in some ways from their older counterparts.  The question is whether those differences are so constitutionally significant that they render mandatory LWOP categorically disproportionate.  And the answer, as I explained in *Parks*, is no: "Even if 18-year-olds are not so well-developed neurologically as 27-year-olds, they are sufficiently neurologically developed to make major decisions about their lives."  See *id*. at 283-284 (CLEMENT, J., dissenting).  The same is, of course, true for 19- and 20-year-olds.

It is especially true regarding the choice to commit first-degree murder.  To return to my initial comment regarding the severity of the crime, first-degree murder is not impulsive; it generally requires, by definition, premeditation and intent.[6]  A 19- or 20-year-

---

[5] *Parks*, 510 Mich at 286 (CLEMENT, J., dissenting) ("[W]e do not generally consider how long a defendant will, as a practical matter, serve a sentence given his or her life expectancy.").

[6] The majority points out that felony murder and the killing of a police officer, MCL 750.316(1)(b) and (c), are also examples of first-degree murder that are punishable by

old capable of planning and executing a murder is capable of understanding its consequences. And if they understand those consequences, then they can constitutionally bear the full weight of the law's most severe punishment.[7]

Finally, the majority confuses the first- and fourth-factor analyses. As stated, the majority focuses on characteristics of the offender, particularly that younger offenders have greater room for neurological growth and thus a better chance at rehabilitation; however, the majority points out that mandatory LWOP fails to consider this possibility of rehabilitation. That may be true, but that analysis should be considered under the fourth factor of our *Lorentzen* test, which considers whether the penalty serves the penological goal of rehabilitation. *Carp*, 496 Mich at 520. The majority is essentially double-dipping by counting the fact that mandatory LWOP does not facilitate rehabilitation under both the fourth and first factors.

In sum, focusing on the gravity of the offense and the severity of the punishment, I believe mandatory LWOP is proportionate for first-degree murder, even when that crime is committed by 19- or 20-year-olds. The first factor weighs in favor of constitutionality.

---

mandatory LWOP, yet do not require premeditation. These cases do not involve those crimes, however, so I see no reason to comment on them. I find it strange that the majority should mention them when they are not at issue.

[7] Even taking the majority's statements regarding the scientific evidence on their face and assuming that 19- and 20-year-olds generally cannot appreciate the consequences even of their deliberate actions, the other factors of the *Lorentzen* test would need to weigh against the constitutionality of mandatory LWOP for these defendants in order to strike down the punishment. For the reasons expressed later, I do not believe the other factors lead to this conclusion.

## B.  SENTENCES IMPOSED IN MICHIGAN FOR OTHER OFFENSES

Next, we consider the sentences imposed for other offenses under Michigan law. *Id*.  This factor, too, supports the constitutionality of mandatory LWOP for 19- and 20-year-olds.  Michigan's sentencing scheme reflects the Legislature's considered judgment that some crimes are so severe, and some offenders so culpable, that LWOP is the only appropriate punishment.  And that judgment is not confined to first-degree murder alone.  Several other offenses are punished with mandatory LWOP, demonstrating that Michigan law does not treat this sentence as an anomaly.  See, e.g., MCL 791.234(6) (listing various offenses subject to mandatory LWOP); MCL 750.316 (first-degree murder); MCL 750.520b (first-degree criminal sexual conduct (CSC-I)); MCL 750.16(5) (adulteration of drugs with intent to kill causing death); MCL 750.18(7) (mixing drugs improperly with intent to kill causing death); MCL 750.211a(2)(f) (possession with intent to unlawfully use an explosive device causing death); MCL 333.17764(7) (mislabeling drugs with intent to kill and causing death); MCL 750.200i(2)(e) (possession of a harmful biological, chemical, radioactive, or electronic device resulting in death).  That mandatory LWOP applies to other homicide offenses as well as to the nonhomicide offense of CSC-I underscores a fundamental point: Michigan law recognizes that the most serious crimes—whether or not they involve the taking of life—are so severe that parole should never be an option.  Yet the majority now declares that first-degree murder, arguably the most serious crime in Michigan law, should be treated more leniently than some of these nonhomicide offenses.

The majority points to the seeming unfairness of defendants being automatically sentenced to LWOP and, as a result, likely spending more time in prison than offenders who were 18 at the time they committed first-degree murder.  Per *Parks*, 18-year-old

offenders are entitled to an individualized sentencing hearing before the imposition of LWOP and, as a result, may be sentenced to a shorter term of years of imprisonment. However, this problem arises no matter where the line is drawn. Now, 21-year-old offenders will receive mandatory LWOP sentences whereas 20-year-old offenders will receive individualized sentencing hearings and possibly shorter sentences. There will always be a sense of possible unfairness about such bright-line rules, but as the United States Supreme Court has said, "a line must be drawn." *Roper v Simmons*, 543 US 551, 574; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

Mandatory LWOP is not excessive when measured against Michigan's sentences for other crimes. The Legislature has imposed mandatory LWOP for multiple offenses, including nonhomicide crimes. While it may be unfortunate for defendants that they would be entitled to individualized sentencing and possibly shorter sentences had they committed first-degree murder when they were slightly younger, that will always be true for some offenders, no matter where courts draw the line. For these reasons, this second factor supports the constitutionality of mandatory LWOP.

C.  SENTENCES IMPOSED IN OTHER JURISDICTIONS FOR THE SAME OFFENSE

For the third factor, we consider the penalties that other jurisdictions impose for first-degree murder. *Carp*, 496 Mich at 520. The majority claims that Michigan is an outlier in mandating LWOP for 19-year-olds. But the national data contradicts that claim. Michigan's sentencing scheme remains consistent with a substantial portion of the country, and evolving standards of decency do not show that mandatory LWOP for 19- and 20-year-olds is unconstitutional.

As the majority notes, 16 states and the federal government impose mandatory LWOP for first-degree murder. That alone distinguishes these cases from pre-*Parks* cases, notably *Bullock*, 440 Mich 15, and *Lorentzen*, 387 Mich 167, where Michigan stood alone—or nearly alone—in imposing a uniquely harsh penalty. In *Bullock*, this Court struck down Michigan's mandatory life sentence for drug offenses after noting that "no other state in the nation imposes a penalty even remotely as severe as Michigan's . . . ." *Bullock*, 440 Mich at 40. Similarly, in *Lorentzen*, we found Michigan's minimum sentence for marijuana distribution unconstitutional because "[o]nly one state . . . has as severe a minimum sentence for the sale of marijuana as Michigan." *Lorentzen*, 387 Mich at 179. That is not the case here.[8] Michigan's sentencing scheme is well within the mainstream of United States law.[9]

---

[8] The majority contends that *Bullock* and *Lorentzen* were simply easier to decide given the facts involved. It is certainly true that the third factor of our test much more clearly weighed against a finding of constitutionality in *Bullock* and *Lorentzen*. I believe the differences between, on the one hand, *Bullock* and *Lorentzen*, and, on the other hand, the instant cases should yield different results. Given that a third of states still impose mandatory LWOP on young adult offenders convicted of first-degree murder, Michigan is hardly an outlier. And I am not aware of another Michigan decision finding that the third factor of our test weighs against a punishment's constitutionality when so many other jurisdictions impose the same punishment for the same crime.

[9] The majority also relies on decisions by the Washington Supreme Court and the Supreme Judicial Court of Massachusetts, see *In re Personal Restraint of Monschke*, 197 Wash 2d 305; 482 P3d 276 (2021), and *Mattis*, 493 Mass 216 (opinion of the court), in which they held that mandatory LWOP for young offenders violated their state constitutions. But as I explained in *Parks*, *Monschke* is not persuasive because it applied an entirely different constitutional framework. See *Parks*, 510 Mich at 289-290 (CLEMENT, J., dissenting) (discussing the legal tests employed in Washington generally and *Monschke* specifically, and noting how those tests differ from ours). Washington's constitutional test for cruel punishment is broader than Michigan's, see Wash Const 1889, art 1, § 14 (prohibiting cruel punishment), making its reasoning inapplicable here. As for *Mattis*, the Massachusetts court split four to three in that case. Much of the reasoning in the two dissents is similar

10

The majority further supports its reasoning by citing sentencing practices in the United Kingdom and Canada. But constitutional law is not a referendum on global criminal-justice trends. Foreign jurisdictions structure their sentencing laws differently, often under entirely different constitutional frameworks. The majority, however, does not heed that lesson. Instead, it cherry-picks foreign jurisdictions to suggest that Michigan's law is outdated. And in any case, even if engaging in a comparative review of international law were a useful and important endeavor, two countries hardly create a trend.

In sum, Michigan's mandatory LWOP sentence for first-degree murder is not an outlier. It aligns with a substantial portion of the country, distinguishing these cases from pre-*Parks* precedent such as *Bullock* and *Lorentzen*. The majority's use of nonbinding out-of-state court decisions and foreign law is selective and unpersuasive. For these reasons, this factor supports the constitutionality of mandatory LWOP.

## D. REHABILITATION

Finally, we consider whether the punishment serves the goal of rehabilitation. *Carp*, 496 Mich at 520. The majority places great weight on this factor. Admittedly, mandatory LWOP does not allow much opportunity for rehabilitation, with the only possibility for

---

to my reasoning in *Parks* and in these cases. See *Mattis*, 493 Mass at 256 (Lowy, J., dissenting) ("Rather, the Legislature has definitively drawn the line between childhood and adulthood at eighteen, and objective indicia of contemporary standards of decency in the Commonwealth demonstrate support for, rather than objection to, treating individuals within this age range as adults in our criminal justice system when they commit the crime of murder in the first degree."); *id*. at 291 (Cypher, J., dissenting) ("Imposed by judicial fiat, twenty-one minus a day is not tethered to hard science, nor is it joined to 'contemporary standards of decency' as reflected in our criminal statutes.") (citation omitted). Suffice it to say, I find the dissenting opinions much more persuasive than that of the majority in *Mattis*.

11

release being executive clemency.[10]  Yet, although Michigan has emphasized the importance of rehabilitation, rehabilitation is still only one of several sentencing goals.[11] The goal of rehabilitation does not subsume the goals of deterrence, public safety, or retribution—particularly for the most serious offenses.

Nevertheless, with the first three factors of the *Lorentzen* test strongly favoring a finding of constitutionality, I would hold that mandatory LWOP is constitutional as applied to 19- and 20-year-old offenders.  I believe that the majority misapplies *Lorentzen*, which unfortunately leads to disregarding the Legislature's judgment.

## II.  RELIANCE ON NEUROSCIENCE

Just as I set out in my dissent in *Parks*, I continue to view the majority's reliance on neuroscience as a symptom that the question before us is not one suited for the judiciary but rather one that must be considered by the Legislature or the people of this state.  The Court today extends its holding in *Parks* beyond 18-year-old offenders, declaring that individuals under 21 must be treated as juveniles for sentencing purposes.  It does so not

---

[10] *Parks*, 510 Mich at 292 (CLEMENT, J., dissenting) (" '[R]ehabilitation and release are still possible, since defendant still has available to him commutation of sentence by the Governor to a parolable offense or outright pardon.' "), quoting *Hall*, 396 Mich at 658. Contra *Carp*, 496 Mich at 521 (noting that LWOP " 'forswears altogether the rehabilitative ideal' "), quoting *Graham v Florida*, 560 US 48, 74; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[11] *Parks*, 510 Mich at 291 (CLEMENT, J., dissenting) ("[T]here are other valid penological goals, such as retribution, deterrence, and incapacitation."), citing *Lorentzen*, 387 Mich at 180; *People v Broden*, 428 Mich 343, 350; 408 NW2d 789 (1987) ("[A]mong the proper criteria for determining an appropriate sentence are: (1) the disciplining of the wrongdoer, (2) the protection of society, (3) the potential for reformation of the offender, and (4) the deterring of others from committing like offenses.").

so much by reference to constitutional text or established legal principles, but by invoking a parade of neuroscientific studies that suggest that young adults are generally less culpable because of incomplete brain development. Indeed, the opinion reads less like a judicial decision interpreting our Constitution and more like an amicus brief from a behavioral-science institute. Courts should not reshape the law with every shift in scientific consensus, especially when it is the Michigan Constitution that is the subject of reshaping.

Similarly, that courts consider "evolving standards of decency"[12] when deciding claims under Const 1963, art 1, § 16 should not be taken as a license for judges to impose their own policy preferences. If anything, that the particular constitutional provision here allows for the consideration of "evolving standards of decency" is all the more reason to be sure that the Court applies the *Lorentzen* factors very carefully and avoids creating sudden, disruptive shifts in the law. If "evolving standards of decency" is interpreted too loosely, it risks serving as an excuse for the judiciary to substitute its own policy preferences for those of the Legislature by striking down constitutional statutes. I fear that is exactly what is happening here. A legislatively mandated punishment that, in my opinion, passes constitutional muster is struck down. This looks less like constitutional interpretation and more like judicial legislation.

---

[12] See *Lorentzen*, 387 Mich at 179. I take no position here on whether I agree with the "evolving standards of decency" inquiry. Our Court has looked to evolving standards of decency in the past, e.g., through the second and third factors of the *Lorentzen* test, and we have not been asked to reconsider that decision.

Moreover, I cautioned in *Parks* that our decision there would invite more claims that we should extend *Miller*'s protections further.[13] The majority itself concedes that "some of the mitigating characteristics discussed in the scientific research relied on in *Parks* and submitted by defendants and amici in these cases are relevant up to at least age 25." In addition to cases regarding the extension of *Miller*'s protections to older defendants, there are several other related claims to which the majority opens the door. If suboptimal brain development makes an offender less culpable, then should any cognitive disabilities or mental illnesses, even those far short of the already recognized insanity defense,[14] serve as a constitutional barrier to mandatory LWOP? Similarly, does cognitive decline in the elderly also preclude mandatory LWOP for them? If mandatory LWOP is unconstitutional for 19- and 20-year-old defendants who are convicted of first-degree murder, why should it be constitutional for such defendants who are convicted of other crimes? The majority's logic has no natural stopping point.

---

[13] In particular, I stated:

> [I]nsofar as the majority's holding is a policy decision, it is one for which there is no clear limiting principle. I would not be surprised if the Court extends its current line in the near future. The science defendant offers indicates that there is significant neurological development until age 25, and while the majority acknowledges this science, the majority today extends *Miller*'s and *Montgomery*'s holdings only to offenders who are 18 years old. I assume that in the coming years we will hear cases arguing that we should extend *Miller*'s protection to those in their early twenties as well. [*Parks*, 510 Mich at 298 (CLEMENT, J., dissenting).]

[14] MCL 768.21a.

## III. CONCLUSION

The Court today extends *Parks* though the Constitution does not require it.  Just as I did in *Parks*, I once again disagree with the majority's analysis of the *Lorentzen* factors and do not believe that the evidence supports the conclusion that mandatory LWOP for 19- and 20-year-olds violates Const 1963, art 1, § 16.  Therefore, I dissent.

Elizabeth T. Clement
Brian K. Zahra